(No. 15634.—Reversed and remanded.)

The Nestor Johnson Manufacturing Company, Appellant, *vs.* The Alfred Johnson Skate Company, Appellee.

*Opinion filed April 14, 1924—Rehearing denied October 8, 1924.*

1. Trade—*when use of name amounts to unfair competition—injunction.* Where a manufactured article is sold to the public under the name of the manufacturer and has become so well known that the name has become identified with the manufacturer's business, the use of the name by another manufacturer of the same article, although it is also his own name, amounts to unfair competition and will be enjoined whether or not it is a trade-mark, where the second manufacturer makes no effort to distinguish his article from that of the other but uses similar marks, packages and devices of business so as to confuse the public.

2. Same—*when a manufacturer of skates will be restricted in use of name.* Where a corporation known as the Nestor Johnson Manufacturing Company has manufactured Nestor Johnson tubular skates for so many years that the name "Johnson" is identified with the skates so manufactured, a brother of Nestor Johnson, with others who were employed by said company, will not be permitted, after withdrawing from the company and organizing the Alfred Johnson Skate Company, to manufacture and sell skates under the name "Johnson" unless the words, "Not connected with the Nestor Johnson Manufacturing Company," are used in the distribution and advertisement of skates.

3. Same—*when complainant seeking to enjoin unfair competition is not guilty of laches.* A complainant seeking to enjoin unfair competition in the use of a trade name applied to an article manufactured by it is not guilty of *laches* in not bringing its suit

until nearly two years after the defendants began to manufacture the article and to use the name, where the name used is a family name and where it could not be determined that confusion would result until it was found that the defendants were distributing the article without any attempt to distinguish it from the complainant's, but, on the other hand, used marks, packages and methods of business calculated to deceive, and which did deceive, the public.

4. SAME—*complainant must show actual or probable deception.* It is sufficient to make out a case of unfair competition to show that deception will be the natural and probable result of the defendants' acts, but either actual or probable deception and confusion must be shown, and if there is no possibility of confusion or if the deceptive tendency is not clear, equity will not interfere until actual deception has resulted.

5. SAME—*when use of family name will be restricted.* In the absence of contract, fraud or estoppel any man may use his own name in all legitimate ways and as the whole or a part of a corporate name, but where the use of his own name upon his goods leads the public to believe that those goods are the product of a well known concern, as was known and (if it be material) was contemplated by the later competitor, the law will require him to take reasonable precautions to prevent deception.

6. SAME—*when cross-error cannot be assigned against decree.* Where a bill to enjoin unfair competition makes defendants both the corporation and the individuals composing it, and the bill is dismissed as to the individuals, the corporation alone being enjoined, the complainant, on appeal by the corporation from the decree, cannot assign cross-error on that part of the decree dismissing the bill as to the individuals.

APPEAL from the Second Division of the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding.

ZANE, MORSE & NORMAN, for appellant.

ISAAC S. ROTHSCHILD, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The Nestor Johnson Manufacturing Company filed a bill on September 18, 1919, in the superior court of Cook county to restrain the Alfred Johnson Skate Company and

Julian T. Fitzgerald, Alfred Johnson and Gustav E. Schmidt from certain acts and conduct in connection with the manufacture and sale of skates, which were alleged to be wrongful, to constitute unfair competition with the complainant and to be productive of irreparable damage to it, and for an accounting. Answers and replications were filed and the cause was referred to a master in chancery, who heard the evidence and reported it with his findings of fact, and recommended that the relief prayed for be granted, except that no recommendation was made as to an accounting. Objections by the complainant and defendants, respectively, were overruled, and the court entered a decree dismissing the bill as to the individual defendants and restraining the Alfred Johnson Skate Company, "first, from using in the advertising, disposition, distribution or sale of tubular ice skates, upon any skate, box, container, letter-head, catalogue, literature, sign, advertising matter or otherwise, or verbally, the word 'Johnson' in its secondary sense as hereinbefore defined, in the description or partial description of, or as the name or part of the name of, a tubular ice skate; second, from using in the advertising, disposition, distribution or sale of tubular ice skates, upon any skate, box, container, letter-head, catalogue, literature, sign, advertising matter or otherwise, the name 'Alfred Johnson Skate Company' in print, script or writing in any form without the four words of said name set forth in equal prominence and in the same character and size of type, script or writing, and without adding thereto in type, script or writing of the same character, and not less than two-thirds the size of the said type, script or writing by which the said name 'Alfred Johnson Skate Company' is displayed, the words, 'Not connected with the original Nestor Johnson Manufacturing Company.'" The decree also awarded an accounting against the Alfred Johnson Skate Company for all profits that accrued to it from the use of the trade name "Johnson" in its secondary sense as defined in the decree, applied to tubu-

lar ice skates made, sold or delivered by the Alfred John-
son Skate Company at any time subsequent to the date of
service of summons.  The Alfred Johnson Skate Company
appealed to the Appellate Court for the First District.  The
complainant assigned cross-errors on the dismissal of the
individual defendants and the failure to restrain the use of
the word "Johnson" in the corporate name of the Alfred
Johnson Skate Company.  The Appellate Court reversed
the decree and remanded the cause, with directions to dis-
miss the bill for want of equity, and the Nestor Johnson
Manufacturing Company having obtained a certificate of
importance has appealed.

The bill alleged that Nestor Johnson more than twenty-
five years ago in Chicago was a skater of great skill and
ability, favorably known among the skaters of the United
States, and was the originator of a skate known and called
"tubular ice skate," of which he was known among the skat-
ing profession and the skating public of the United States
as the designer and originator; that he then commenced
the manufacture and sale of such skates in Chicago and
continued such manufacture and sale until 1912, when he
sold his business, and all rights to his trade-marks, trade
name and good will, to the complainant, which has since
continued the business; that he had built up a large and
valuable business and created a great demand for his skates,
which by reason of his large personal acquaintance and his
reputation as a skater and as the originator of tubular ice
skates became known to the wholesale and retail trade and
to the skating public as "Johnson skates," and when used
to designate skates, the word "Johnson" had for many
years been known by skaters and the skating public to des-
ignate a tubular ice skate sold first by Nestor Johnson and
later by the complainant; and Nestor Johnson and his suc-
cessor, the complainant, have spent large sums of money in
advertising and creating a demand for Johnson skates.  The
bill alleged that Julian T. Fitzgerald, one of the defendants,

had been employed for a number of years by Nestor Johnson, and later by the complainant, in different positions; that a part of the time he was sales manager and conducted all of the advertising of the complainant and learned its method of making skates and of advertising them, and was in intimate touch with all, and became personally acquainted with a great many, of the principal customers of the complainant; that Alfred Johnson, another of the defendants, is a brother of Nestor Johnson, and was employed first by Nestor Johnson and later by the complainant for a period of sixteen years, in which employment he learned the business of making tubular ice skates and acquired an intimate knowledge of the business methods of the complainant; that Gustav E. Schmidt, the third of the individual defendants, was employed by Nestor Johnson and the complainant for a period of eight years, being in charge of manufacturing dies, tempering metal for skates, and employed in other parts of the business, and learned from his employment the business of making tubular ice skates; that the three men quit their employment on March 1, 1917, having previously planned to form the Alfred Johnson Skate Company with the fraudulent intent of defrauding the complainant and appropriating its good name, good will and business, and that they caused the Alfred Johnson Skate Company to be incorporated, and it began the manufacture and sale of tubular ice skates, advertising them to the public as the Alfred Johnson skates. The bill then sets forth in great detail the acts of the defendants in the conduct of their business calculated and intended to deceive the customers of the complainant and the public, and lead them to believe that the skates manufactured and sold by the Alfred Johnson Skate Company were the product of the complainant, and to lead them to deal with the latter company supposing that they were dealing with the complainant and that the skates purchased of the Alfred Johnson Skate Company were the product of the complainant; and it is alleged that by

these acts the public was deceived and was caused to purchase the product of the Alfred Johnson Skate Company for that of the complainant.

The answer denied that Nestor Johnson was the originator of tubular ice skates, and averred that before he made them they were associated with John S. Johnson, a champion ice skater between 1890 and 1900, who used such skates in his racing, and with Arthur Johnson, of New York, who made and sold them as Johnson skates. It is denied that Nestor Johnson or the complainant has used the name "Johnson" as a part of a trade name, and it is alleged that Fitzgerald, Schmidt and Alfred Johnson were in charge of the manufacturing of the complainant's skates, and whatever excellence of manufacture the complainant attained was due to them; that since they severed their connection with the complainant Nestor Johnson has sold all his interest in the complainant, and since that time the complainant has been in charge of altogether different persons, who were not acquainted with the processes of manufacture; that the complainant has concealed this condition from the public and has falsely advertised that its product was manufactured under the same processes as those pursued by Nestor Johnson, so that the public is being deceived, and it is alleged that such success as the Alfred Johnson Skate Company has achieved has been due to the skill of Fitzgerald, Schmidt and Alfred Johnson and their wide acquaintance and popularity, and that the complainant is beginning to imitate their methods of advertising to deceive the public.

The basis upon which the complainant may be entitled to relief is that the name "Johnson" in connection with tubular ice skates has acquired such a meaning with the skating profession and the public and in the trade as to indicate the complainant as the manufacturer of any tubular ice skates bearing the name "Johnson." If the name has acquired this secondary meaning so as to become identified with the complainant's business and the skates of its manu-

facture, another will not be permitted to use the same name in such a way as to lead purchasers from the latter to believe that they are buying the skates of the former. (*De-Long Hook and Eye Co.* v. *Hump Hairpin Co. 297* Ill. 359.) The first question for determination, therefore, is whether the name has acquired such secondary meaning. If it has, then no trade-mark is necessary to entitle the complainant to an injunction, if the defendants' use of the name and of its marks, packages and devices and methods is such as is likely to deceive purchasers of the defendants' skates into believing they are buying the complainant's skates. Such use of the name, and of such marks, packages, devices and methods, amounts to unfair competition, and in such case the question is whether the use is of such a character as to deceive purchasers, with the result that the goods of the defendant company are palmed off as the goods of complainant. (*McLean* v. *Fleming, 96* U. S. 245.) The next question, therefore, is whether the defendant company's use of the name and its methods of business were of such a character as to induce purchasers from it to believe they were buying the complainant's skates.

The evidence shows, and the chancellor and the master found, that the complainant is a corporation organized under the laws of Illinois, and since its incorporation by Nestor Johnson, in 1912, has been solely engaged in the business of manufacturing, distributing and selling a peculiar form of tubular ice skate used generally in the United States and Canada and has built up a large and successful business of great value. Nestor Johnson came to this country about 1890 from Norway, where he had attained some distinction as an ice skater. He soon won notice here as an ice skater. He used the peculiar form of tubular ice skate at that time made only in Norway. He developed a large personal acquaintance and successfully promoted skating clubs and skating associations. By trade he was a machinist, and in the early years after coming to this country he followed his

trade in the day time and in the evening he and his wife worked on bicycles and tubular ice skates. In 1895 his tubular ice skate was being sold by A. G. Spalding & Co. in Chicago, and about 1900 the skate was on sale in New York City and in St. Paul and Minneapolis, Minnesota. In 1913 about four thousand pairs of such skates were made, and from that time on the business of the complainant increased very rapidly in volume. In 1917 the trade in these skates extended throughout various parts of the United States and Canada.

The tubular ice skate manufactured by Nestor Johnson and by the complainant consisted of a steel blade or runner inserted in a cylindrical steel tube which supported two upright cylindrical steel tubes, one for the ball and the other for the heel of the foot. The skates were then secured to the sole and heel of a special skating shoe made of leather. These skates were similar to those used in Norway in 1890 except that the Norwegian skates had cups made from sheet iron, and Nestor Johnson and the complainant have made their cups from drawn steel and have put a patent rib on the tube. The Norwegian skates were, moreover, built lower than complainant's skates. The tubular ice skates manufactured by the complainant and its predecessor, Nestor Johnson, had prior to the year 1917 come to be, and were then, known to skaters and the trade in general as Johnson skates. The word "Johnson" had ceased to be only the name of the manufacturer, and had gained a secondary meaning describing and indicating the particular make of tubular ice skates of the Nestor Johnson Manufacturing Company, the complainant.

The defendant the Alfred Johnson Skate Company was incorporated in March, 1917, under the laws of Illinois. The defendants Julian T. Fitzgerald, Alfred Johnson and Gustav E. Schmidt reside in Chicago and are officers and employees of the Alfred Johnson Skate Company. Alfred Johnson was the brother of Nestor Johnson and early in

life had been apprenticed to the trade of shoemaker, the father having worked as cobbler for skate-makers in Norway. Alfred made shoes for the skate-makers in Norway. He accompanied Nestor upon the latter's return to the United States from a visit in Norway in 1901, and lived with the family of Nestor in Chicago until 1916. He entered the employ of Nestor at wages of $10 a week at a time when the production of skates was about two hundred pairs during the season. In 1917 he was still with the business, in the employ of the complainant, receiving wages of $30 a week, together with a bonus based upon sales, and in 1917 had charge of the assembly of skates in the factory. When he came to this country he had no reputation as a skater and thereafter acquired none. He had never engaged in skate-making in his own name. No skate ever bore the name "Alfred Johnson" prior to the organization of the defendant company. He never attended the skating meets or traveled among the trade selling skates, or for any other purpose, prior to the organization of the defendant company. Fitzgerald entered the employ of Nestor Johnson in 1912 and had charge of the office and books of the company, later becoming secretary of the corporation and sales manager. He signed substantially all of the correspondence of the company. He was well known throughout the country in the skate trade as secretary of the complainant and as a promoter of skating races and of skating associations. As sales manager he called upon the skate trade throughout the country, selling the yearly product of the complainant. Schmidt entered the employ of Nestor Johnson in 1908, when eight or nine men were working in the factory. He took charge of the press room, made dies, sold skates and spent a good deal of time in perfecting machinery and dies and improving the processes of tempering the steel blade. During his first year with the company the output of skates was between five hundred and one thousand pairs.

Fitzgerald, Schmidt and Alfred Johnson decided in January, 1917, to leave the employment of the complainant because of the putting in the factory of a general superintendent over them.   They, together with Stanley W. Blum and J. G. Landauer, organized the Alfred Johnson Skate Company, which was incorporated in March, 1917, for the purpose of manufacturing and selling a tubular ice skate, which it has manufactured and sold throughout the United States since that time.   Blum lived in New York and was interested in the Jack Shannon Company, which was engaged in selling sporting goods in Chicago.   Landauer was a stockholder and was the representative of Blum in Chicago.   Blum had endeavored to acquire an interest in the complainant in 1915 and 1916, when the demand for these skates exceeded the supply.   At that time he visited the complainant's plant and became acquainted with Fitzgerald, Schmidt and Alfred Johnson.   These three conferred with Blum with a view to raising the capital for a new skate company.   Fitzgerald, Schmidt and Alfred Johnson left the complainant's employment March 1, 1917.   The inclusion of the name "Johnson" in the name of the new company had been arranged prior thereto, two letters having been written by Blum to the Crucible Steel Company of America in February, signed "A. Johnson Skate Company." Blum testified that from the first he had the name "Johnson" in mind as the name of the new company.   Alfred Johnson was made president of the new company, with limitations upon his authority, including a requirement that company checks signed by him must have the countersignature either of Blum or Landauer, Blum's representative.   Schmidt was made vice-president, Fitzgerald secretary and sales manager, Landauer treasurer, and Blum assistant treasurer.   No. 2812 North avenue, Chicago, the place of business of the defendant company, was about half a mile from the factory and place of business of the complainant, facing, as does the factory of the complainant, upon

Humboldt Park, the skating center on the northwest side in Chicago.

Defendants in their answer denied that Nestor Johnson was the first maker of tubular ice skates in the United States, and alleged that before he manufactured skates, Arthur Johnson in New York began the manufacture of tubular ice skates and has continuously manufactured them since, of the same type as those manufactured by complainant. It was also alleged that John S. Johnson was a champion skater between 1890 and 1900 who used tubular skates of the same type as those manufactured by the complainant and of similar appearance; that they were not of Nestor Johnson's or the complainant's manufacture but were known as Johnson skates, and the name "Johnson" in connection with tubular ice skates, when Nestor Johnson first manufactured tubular ice skates, was associated with Arthur Johnson and John S. Johnson. The evidence shows that John S. Johnson lived in Minneapolis and was a skater of renown from 1892 to 1899. He used tubular skates which were made for him by C. G. Peterson and bore the maker's name, "C. G. Peterson, Maker, Minneapolis." He never made a pair of skates with the name "Johnson" on them, he has made none since 1900, and there is no evidence that his skates were ever sold in the Chicago market. Arthur Johnson had some tubular skates manufactured for him from his own dies by a machinist named Fitzgerald as early as 1897 which were sold as the Johnson Racer, the name appearing on the skate. They were sold mostly in New York and there is no evidence that any were sold outside of New York. The manufacture and sale of this skate was discontinued in 1900. After that year Nestor Johnson was the only Johnson who was a maker of tubular ice skates and had the exclusive use of that name as a manufacturer of tubular ice skates. His skates were all known as Johnson skates and no others were so known. They were marked with that name, were sold in skate markets in this

country and Canada, and Johnson skates were understood to be skates made by Nestor Johnson. There were different varieties of the skates,—"North Star," "Hockey" and "Racer,"—but all were Johnson skates. In 1912, when the complainant was organized, the right to the use of the name and of all trade-marks was transferred to the complainant. Until 1917, when the defendant company was organized, the evidence shows that a Johnson skate was understood to mean a skate manufactured by Nestor Johnson or the complainant. Neither the complainant nor Nestor Johnson had any patent on tubular ice skates which was infringed. Anybody could make such skates, and many did so, but no one except Nestor Johnson used the name "Johnson." The trade and the public in the purchase of skates necessarily regarded the skates purchased as the manufacture of the maker whose name appeared on the skates. It was only by such name or by a trade-mark that the manufacture of the different makers of tubular ice skates could be distinguished. Hence tubular ice skates manufactured by Planert were called Planert skates, by Dunn were called Dunn skates, by Stacey were called Stacey skates, and so of all the different makers.

From the fact that the master found that prior to the filing of the bill of complaint the word "Johnson" ceased to be longer the name of the manufacturer but gained a secondary meaning which described and indicated the particular make of tubular skates of the Nestor Johnson Manufacturing Company, that this association of ideas was not unusual but existed among the persons who knew of the existence of the Nestor Johnson Manufacturing Company at the time of the bringing of this action, and that at the time of the filing of the bill of complaint the name "Johnson" was so well known that it described not only the skates manufactured by the complainant but around Humboldt Park it extended to all tubular skates, it is argued by the appellee that it is unmistakably established that tubu-

lar skates of all makes were called "Johnson" by the public in 1917, and that this refutes the claim that the name "Johnson" is the secondary name for a tubular skate. On the contrary, it sustains the claim of the appellant that the name "Johnson" on a tubular skate is known by skaters and the skating public to designate the particular make of tubular ice skates manufactured and sold by Nestor Johnson and later by the complainant. Anybody may make such a skate but nobody has the right to sell it under the name "Johnson," thus deceiving purchasers into believing that they are buying the manufacture of the complainant. Under the circumstances, even if all tubular skates did become known as Johnson skates because of the number and quality of those manufactured by Nestor Johnson and the complainant, this would not justify another manufacturer in making use of the reputation and good will acquired by the efforts of Nestor Johnson and the complainant to deceive the public and injure the complainant in the sale of skates.

The new corporation, after having adopted a name the distinguishing part of which was the name "Johnson," engaged solely in manufacturing and selling a tubular ice skate identical with the complainant's except for a few minor structural differences not noticeable to the ordinary buyer. The tubular skate business had been developed into a valuable trade and was growing. The three men from the Nestor Johnson Company knew the business in its entirety,—both manufacturing and selling. The business was open to them, and they were better qualified to get it than anyone else, so far as the record shows, except the complainant. The law restricted them only to the extent that they were forbidden to get the complainant's business by unfair competition, by palming off their products as the products of the complainant or by appropriating the reputation of the complainant's goods to their own use. Their first act was the selection of a name for their corporation. Every name was open to them to choose, and the name "Johnson" was

associated in the trade and public mind with tubular skates. They chose that name and called their corporation "The Alfred Johnson Skate Company." The result naturally to be expected was that their skates would be considered Johnson skates, and that result followed. The complainant's factory was located on Humboldt Park, in Chicago,—the skating center of the city,—at 1237 North California avenue. The new company located its factory on that park at 2812 West North avenue. Nestor Johnson was president of the complainant, and Alfred Johnson was made president of the new company. Fitzgerald had been sales manager and secretary of the complainant and as such had signed its correspondence. He was made secretary of the new company. The corporation so named, officered and located, organized for the purpose of making and selling skates which had already become known as the product upon which the name "Johnson" meant that it had been produced by Nestor Johnson or the complainant, was well adapted to deceive the public and make it difficult for the public to distinguish the new corporation from the complainant, to the disadvantage of the complainant.

The Nestor Johnson skates were prominently marked "North Star," together with the name of the company. The marking appeared upon the decalcomania transfer stamps that were placed on the skates. A similar transfer was used by the defendant company, and it marked its skates "North Avenue," with the name of the company, without any number, apparently using the word "North" in a manner similar to its use by the complainant for the purpose of confusing the skates among buyers. The defendant Fitzgerald, the secretary and sales manager of the defendant company, prior to the filing of the bill told J. W. Clark, the president of the complainant, to whom Nestor Johnson sold his stock in 1917, that people familiar with the name "Johnson" would buy any skates with that name on them, and that the name "Johnson" was the whole thing. Similar

statements were testified to by Eugene R. Phillips, a skate dealer in Minneapolis and St. Paul, from which it appears that Fitzgerald was using the reputation which the complainant's products had, to sell the skates of the new company, and recognized the fact that the name "Johnson" applied to tubular skates assured their sale.

In the defendant company's first catalogue three kinds of skates were advertised,—the Biltmore, Professional and Official Hockey,—names not used by the complainant, and upon each page of the catalogue these names were prominently preceded by the name "Alfred Johnson," which was used throughout the catalogue prominently and frequently in describing the skates of the new company, the catalogue ending with the statement, "Our name your guarantee." One of the schemes of advertising which the complainant had adopted in 1916 was a skating cap, of which it bought four or five hundred, and a Jersey emblem, of which it bought some. Both caps and emblems were distributed. In addition to the design of a winged shoe supported on a tubular skate, there appeared on the cap and the emblem the words "North Star" and "Johnson," the latter in slanting script, the letter "J" being peculiar. The Alfred Johnson Skate Company adopted for use on all its literature the words "Alfred Johnson" in slanting script, the word "Johnson," especially the "J," resembling in general appearance the "Johnson" that the complainant had used on its caps and Jersey emblems. The complainant had adopted a shoe supported by a skate as an emblem, which is used in much of its advertisements. The new company adopted the same sort of advertising. There was displayed upon the skates in its catalogue and throughout its advertising a script "Alfred Johnson," some of the advertising stating it to be the signature of Alfred Johnson. This script was a characteristic feature of its advertising. The new company claimed to be the largest skate manufacturing company and laid stress upon that fact in its advertising, and also upon

the length of time Alfred Johnson had been engaged in the business. From the beginning the defendant company prospered. Many of the methods of carrying on business by the complainant were copied by the defendant company. In corresponding, Fitzgerald, the secretary of the complainant, had been in the habit of signing the letters. The same plan was carried on by the defendant company, where Fitzgerald, as secretary, signed much of the correspondence. The names on the letter-heads were arranged in practically the same way, "Alfred Johnson" being substituted for "Nestor Johnson." As sales manager for the complainant, Fitzgerald knew its customers, and immediately upon the incorporation of the defendant company he began sending its literature to prospective buyers, including the complainant's customers. The complainant packed and delivered its skates in a plain, corrugated pasteboard box. No other skate company at that time used a similar box, but the defendant company purchased the same kind of corrugated pasteboard boxes from the same box manufacturers, and the boxes looked very much alike. The result of the methods used by the defendant company was to create confusion in the minds of the public between the skates manufactured by the complainant and those manufactured by the new company. Ordinary purchasers of skates at retail sometimes received skates made by the defendant company when they expected the skates of the complainant. Both retail dealers and wholesalers were confused, as the evidence shows, in a number of cases. The catalogues and newspaper advertisements of dealers in skates show such confusion. Upon the whole evidence it is apparent that the word "Johnson" was the mark by which the skates sold were identified by purchasers. The word "Alfred" was disregarded. The purchaser, seeing the word "Johnson," accepted it as signifying that the skates bearing it were manufactured by the Nestor Johnson Company, and in consequence purchased the skates upon the reputation of that company without re-

gard to the name "Alfred." The advertisements of dealers advertising Alfred Johnson skates as the original Johnson or original Nestor Johnson skates, not only show that the dealers themselves were deceived, but also that they thought the only Johnson skate was the Nestor Johnson skate, which was well known. For instance, a dealer in Pittsburg advertised in January, 1918, "The Famous Alfred Johnson North Star Tubular Skating Outfit." A dealer at Laronae Lodge, New York, advertised in his 1918 catalogue the Alfred Johnson Skate Company skates as "The Original Johnson Hockey and Racing Skates," "The Johnson Skates," and "The Celebrated Johnson Skates." The Siegel Hardware Company on December 12, 1918, advertised in the *Duluth Herald* the Alfred Johnson Skate Company's skates as "Genuine North Star" skates. The Warner Hardware Company advertised in the *Minneapolis Tribune* the skates of the Alfred Johnson Skate Company as "Nestor Johnson Tube Skates" and "Nestor Johnson's North Star." A number of other cases of this kind appear in the evidence, and it is apparent that the dealers so advertising regarded the Johnson skate as meaning the Nestor Johnson skate, in spite of the name "Alfred Johnson" appearing on the skate itself. There was a good deal of confusion in the correspondence of the two companies, showing that purchasers of skates from the Alfred Johnson Skate Company thought that they had bought the skates of the complainant. A dealer in Detroit ordered from the complainant twenty-three pairs of skates by the names advertised by the Alfred Johnson Skate Company. Scruggs, Vandervoort & Barney, of St. Louis, mailed to Alfred Johnson, at the address of the complainant, letters saying they were returning one pair of Nestor Johnson hockey skates because of a defective strap, and enclosing a bill charging Alfred Johnson with a pair of Nestor Johnson skates. This letter was delivered to the Alfred Johnson Skate Company. The box of skates was also addressed

to the Alfred Johnson Skate Company at the complainant's address and was delivered to the complainant. Evidence of other errors of a similar character appears in the record, indicating the confusion of dealers and other purchasers between the two companies.

The conclusion arises from the evidence that when Fitzgerald, Johnson and Schmidt left the complainant's employment for the purpose of engaging in the skate business for themselves and organized the corporation for that purpose, they gave it the name "Alfred Johnson" for the purpose of making use of the reputation of the name "Johnson" with the skating public to acquire business from the Nestor Johnson Company; that Fitzgerald took the names of the customers of that company with him for the same purpose; that their catalogues, letter-heads and advertising matter were made in imitation of those of the complainant for the same purpose, as was also the advertising of the celebrated Alfred Johnson skates, which had never before been manufactured or sold.

The bill was filed two years and a half after the incorporation of the new company, and it is contended that this delay was *laches* which bars the maintenance of the bill. It cannot be regarded as an unreasonable delay that the complainant waited until the defendants had actually launched their enterprise and had committed the act showing deception in their method of business and the confusion resulting from it. No skates were made until October, 1917, and no cases of actual deception arose until after that time. While it is sufficient to make out a case of unfair competition to show that deception will be the natural and probable result of a defendant's acts, either actual or probable deception and confusion must be shown. If there is no possibility of confusion there is no unfair competition, and where the deceptive tendency is not clear, equity will not enjoin until actual deception has resulted. Mere possibility of deception is not enough. (*Columbia Engineering Works*

v. *Mallory*, 75 Ore. 542.)   The cases of confusion and deception shown in the record arose in 1918 or later.   If suit had been brought within six months of the incorporation of the defendant company no actual case of confusion could have been shown and the complaint might have failed for lack of proof.   The mere inclusion of the word "Johnson" in the name of the new company could not have been made the basis for an injunction, for it could not be assumed that the defendants ·would not so distinguish the products of the new company from those of the old as to prevent confusion.   Upon the organization of the new company it caused notice to be sent to skate dealers and magazines in such terms as to allay any fear of a wrongful purpose.   In this announcement it was said:   "We wish to announce that Messrs. Alfred Johnson, Gustav E. Schmidt and Julian T. Fitzgerald, for many years connected with the Nestor Johnson Manufacturing Company, have severed their connections with the aforesaid company and have organized and incorporated the Alfred Johnson Skate Company, which will manufacture a new and complete line of tubular ice skates," etc.   The new company had no skates for sale until the season of 1917-18, and it was not until December, 1917, that its catalogue was sent out to the trade, modeled as to form and contents on that of the complainant, and the confusion and unfair competition began to appear.   The suit was brought within less than two years after the appellee's skates were first put on the market.   It would be unfair to require the complainant to bring a suit before evidence was available to sustain it.   The drastic remedy by injunction will not be applied upon suspicion of an intended wrong.   The period which the complainant waited was not too long, considering that it is required to prove the case by evidence of acts of fraudulent intention resulting in injury to itself.   That it did not wait too long is shown by the zeal with which it is now argued that even yet there is not sufficient evidence to justify relief by injunction, and

by the finding of the Appellate Court that the evidence is insufficient. The complainant was not guilty of *laches* in taking sufficient time to collect its proof before filing its bill, and the delay in this case does not seem unreasonable.

The appellee argues that the name "Johnson" is a family name in ordinary use, which may not be exclusively appropriated in trade and is incapable of appropriation as a trade-mark, and that the use of a family name by a corporation stands upon the same footing as its use by an individual or firm. This proposition is sustained by *Howe Scale Co.* v. *Wyckoff*, 198 U. S. 118, and numerous other decisions both before and since. In the case cited it was said that "in the absence of contract, fraud or estoppel any man may use his own name in all legitimate ways and as the whole or a part of a corporate name." "But whatever generality of expression there may have been in the earlier cases, it now is established that when the use of his own name upon his goods by a later competitor will, and does, lead the public to understand that those goods are the product of a concern already established and well known under that name, and when the profit of the confusion is known to, and, if that be material, is intended by, the later man, the law will require him to take reasonable precautions to prevent the mistake. (*Herring-Hall-Marvin Safe Co.* v. *Hall's Safe Co.* 208 U. S. 554.) There is no distinction between corporations and natural persons in the principle, which is to prevent a fraud." *Waterman Co.* v. *Modern Pen Co.* 235 U. S. 88.

The appellant insists that the decree of the circuit court dismissing the bill as to the individual defendants should be reversed. It assigned cross-errors on this part of the decree in the Appellate Court, but the Appellate Court had no jurisdiction of the individual defendants in the circuit court. There was no joint decree in the circuit court. The relief granted was against the corporation, alone. Its appeal did not bring the individual defendants before the Ap-

pellate Court. If the complainant was dissatisfied with the decree dismissing its bill against the individual defendants it might have appealed, but the appeal of the corporation brought up nothing but the decree against it and did not authorize the assignment of cross-errors against the decree in favor of the other defendants. *Walker* v. *Montgomery,* 236 Ill. 244; *Glos* v. *Woodard,* 202 id. 480.

The appellant assigned in the Appellate Court cross-error upon the failure of the superior court to enjoin the use of the word "Johnson" either in the corporate name of the appellee or in connection with the sale, distribution and advertising of its skates. The decree enjoined the use of the name "Alfred Johnson Skate Company" without the use of the words, "Not connected with the original Nestor Johnson Manufacturing Company." It is contended that this relief is not adequate, but in our judgment it is not necessary to enjoin entirely the use of the word "Johnson" or the appellee's corporate name. The object is to prevent the deception of purchasers, and the decree was sufficient for this purpose without the use of the word "original," which it directed should be used in the reference to the Nestor Johnson Manufacturing Company, required as a suffix to appellee's corporate name. This word should be stricken out of the suffix which the decree required to be used in connection with the appellee's corporate name.

So far as the decree provides for an accounting, it is correct.

The judgment of the Appellate Court for the First District and the decree of the superior court of Cook county will be reversed and the cause will be remanded to the superior court, with directions to enter a decree in accordance with the views herein expressed.

*Reversed and remanded, with directions.*