(No. 18214.—

BERTHOLD BONDY *et al.* Appellants, *vs.* MAURICE W. SAM-
UELS *et al.* Appellees.

*Opinion filed February 20, 1929.*

Farmer, J., dissenting.

Oscar E. Carlstrom, Attorney General, Leesman, Roemer & Schnell, and Albert D. Rodenberg, (V. F. Lumley, Fred B. Bennett, and Elmer M. Leesman, of counsel,) for appellants.

Moses, Kennedy, Stein & Bachrach, (Walter Bachrach, and Walter H. Moses, of counsel,) for appellees.

Mr. Commissioner Partlow reported this opinion:

This is an appeal from a decree of the circuit court of McHenry county dismissing for want of equity appellants' bill filed during August, 1926, seeking to perpetually enjoin appellees from altering the shore line of Crystal Lake, in that county, by building out land into the lake adjacent to appellees' property and by mandatory injunction compel the removal of any such fill or obstructions already made.

The material facts involved in this litigation are, that appellants and appellees are the owners of adjoining summer resort residence property which is improved and located in a platted subdivision known as Prospect Point, a peninsula or promontory extending into Crystal Lake on its northerly side. The shore line of the properties affected by the fill faces east. Appellees own approximately the south 325 feet of shore line on the east side of the peninsula and appellants own 116 feet of shore line immediately north thereof, together with other riparian property located still further to the north, all of which was purchased by appellants at different times between 1918 and 1923 from appellees or persons holding title for appellees. The original shore line along the east side of the peninsula gradually receded in a southwesterly direction from appellants' property known as lots 4, 5 and part of lot 6, along appellees' property designated as lots 6 and 8, to the point or end of the peninsula, making a broad and unobstructed expanse of the waters of the lake visible in three directions from near the shore line of appellants' property. The shore line of the properties was somewhat broken, and during previous years some work had seemingly been done along the water's edge upon at least a part of the properties here involved. There was a large sand-bar in the lake immediately in front of appellees' lot 8, and it appears this bar at certain seasons of the year interfered to some extent with the use of the waters of the lake in that vicinity for bathing and boating purposes. Prior to April, 1926, appellees installed, for use upon the water adjacent to their property, the necessary machinery to operate a sand-sucker, for the purpose of sucking sand from the bottom of the lake within the boundaries of the submerged properties alleged to be owned by appellees and depositing the same in front of or along their shore line. This method of land-making continued, except for a short interruption, from April until August 12, 1926, when a temporary injunction was issued. The fill into the

lake projected out from the shore line at the boundary line between appellants' and appellees' properties in a slightly southeasterly direction to a distance of 60 feet or more, and at the extreme south end of the peninsula the width of the fill was about 157 feet. A line of rocks or boulders was placed near the edge of the new shore line, and black soil for the purpose of growing vegetation was placed over a small area of the northerly part of the fill and near the old shore line.

Crystal Lake was included in the government survey without regard to its boundaries, and the land, when sold, included the bed of the lake. In 1896 the land involved belonged to Charles Dole and wife, who conveyed it in trust to Albert Stowell and wife. October 27, 1897, the Stowells conveyed to Fremont Hoy a part of the land 500 feet square, describing it, and also conveyed, "as an appurtenance to the land first above described, the right to bathe in the waters of Crystal Lake now owned by them, and in a lawful and sportsmanlike manner to boat and fish on any of the waters of Crystal Lake now owned by them, said easements and privilege to extend to the family of the said party of the second part, his heirs and assigns, lessees or tenants, and his or their guests, but does not extend to the use of said waters or easements for any commercial purposes or to derive any profit therefrom nor the right to cut ice on the lands above conveyed; that it is expressly understood that the parties of the first part reserve the right to cut ice on any of the premises or land hereby conveyed which shall or may be submerged and covered by the waters of Crystal Lake." In the same deed the grantee covenanted and agreed for himself, his heirs or assigns, that "neither he nor they will at any time contaminate or pollute the waters of said Crystal Lake by causing, or with their consent permitting, sewerage or drainage to run into the same or by throwing garbage or refuse of any kind therein, and that they will not at any time use the premises granted for

manufacturing purposes, nor for hotel or club house, nor for a saloon or place where intoxicating liquors shall or may be sold, nor for public picnic grounds, nor for any immoral purpose, nor for any other purpose which might or could pollute or injure the purity of the waters of said Crystal Lake or render the shore and property adjacent thereto less desirable for residence property; and the said party of the second part further covenants and agrees, for himelf, his heirs, executors, successors, representatives, grantees and assigns, that the premises above granted shall revert to the parties of the first part, their successors or assigns, in case of a breach of any provisions above made, and that a breach of such conditions shall of itself operate to extinguish the title granted by this deed." A paragraph containing restrictions similar to those last recited was contained in the deed binding the grantors, their successors or assigns. The grantors also covenanted and agreed that like restrictions, except as to hotel, club house or public picnic grounds, should be inserted in all deeds or leases made by them of all or any lands owned by them and surrounding Crystal Lake, and that a failure to insert such restrictions should be a waiver of all restrictions as to the grantee and the same were thereby made null and void. The grantee in this deed subdivided the property acquired from the Stowells, together with other property lying immediately north, and filed a plat thereof in 1905, designating the subdivision as Prospect Point. It was stated on the plat that "the distances given on the lot lines carry those lines only to the edge of the water at low-water mark, and that that part of the said plat designated as water and lying between said several lot lines extended into the water of Crystal Lake to the several points of intersection of said lines are a part of the several lots which lie between the same lot lines as said water and contiguous to said water." In 1915 Hoy conveyed the entire subdivision to one Shuman by warranty deed, which provided that the conveyance was, together with

all rights and privileges, restricted by all of the requirements mentioned and embodied in the Stowell deed of 1897 to Hoy. In 1916 appellee Samuels purchased from Shuman the four easterly lots of the subdivision. This deed also provided that the conveyance was restricted by all the requirements of the deed of 1897 from Stowell to Hoy. Samuels re-subdivided the four lots into eleven lots and filed a plat thereof in August, 1916. The plat set out that each of the lots bordering upon the lake extended into the water of the lake to the respective east, south and west 500-foot boundary lines of the plat. This plat was used and referred to by appellees in the sale of their property to appellants between 1918 and 1923, and the several deeds conveying title to appellants contained a clause expressly restricting each conveyance to all the requirements mentioned and embodied in the deed of 1897 from Stowell and wife to Hoy. Some of the property originally purchased by appellants from appellees has been sold to and is occupied by other persons but that adjoining appellees has been improved and is used by appellants as a summer home.

The record contains a large amount of testimony concerning different conversations between and statements made by appellees and appellants to each other, and in the presence of other persons, concerning restrictions upon the property and the improvement of the shore line along their respective properties. No useful purpose would be served in setting forth in detail the aforesaid testimony, as it is in some respects highly conflicting. It is shown by the proof that some improvement of their respective shore lines had been contemplated for some time by perhaps both parties. During October, 1925, Samuels applied to the division of waterways of the State Department of Purchases and Construction and obtained a permit to make a fill in the lake adjacent to his east shore line. A plat designating the amount or distance permitted to be filled out into the lake was shown. About that time appellees visited appellants

in their Chicago apartment and the matter of the improvement and its nature were discussed. Seemingly most of the conversation was between Samuels and Mrs. Bondy. A few days later Samuels visited Bondy at the latter's office on Jackson boulevard, in Chicago, where the proposed improvement was again discussed by the parties. Thereafter the two men again met at the Chicago office of the division of waterways and the permit issued by the division to Samuels was there discussed, and an inquiry was made relative to Bondy making application for the improvement of the shore line along his own property. Following that interview a written application for the improvement along the shore line of appellants' property was prepared by the latter with the assistance of Samuels and the same was submitted to the division of waterways. That department notified appellants of its willingness to issue a permit in accordance with appellants' said application upon the acceptance of certain conditions in writing to be made by appellants. This permit was never accepted by appellants and hence no permit was actually given them. During the early part of December, 1925, Bondy telephoned to Samuels advising the latter that Bondy would not join Samuels in the project of improving the shore line. This telephone conversation was followed by a letter written by Bondy to Samuels on December 15 confirming the telephone conversation. As previously stated, appellees continued to make preparations for the improvement of the shore line along their own property and commenced work thereon during April, 1926. Appellants occupied their property during the resort season of 1926, but seemingly there was no conversation or communication of any kind between the parties relative to the shore line work until June, 1926, when an attorney for appellants addressed a letter to appellees notifying the latter of their objection to the fill being made in the lake. Up to this time a large portion of the fill had been made and appellees had spent approximately $4000 in

the undertaking. However, the operation of land-making by appellees continued, and at the time the bill was filed in this case they had spent approximately $6500. It was the contention of appellees that appellants had had complete knowledge of the nature of the fill that appellees intended to make, and during the time that appellants lived upon their premises during the summer of 1926 had had information daily as to the progress which was being made in the work, and prior to the letter from the attorney on June 22 had made no complaint about the manner in which the improvement was being done. On the other hand, the position of appellants was that they did not fully understand the nature of the fill but understood that appellees were merely intending to improve their broken shore line, and that they could not tell until the work was well in progress as to what the plan of appellees was and as to what its effect would be.

The errors relied upon for reversal are, that the conveyances, from all the surrounding circumstances and taking into consideration the nature of the property, gave to appellants an easement against appellees, as their grantors, to have the use and enjoyment of the waters of the lake in the same form and condition as they were when appellants purchased the property and that the contour of the shore line and the expanse of the water should not be disturbed by appellees; that the deeds executed by appellees to appellants referred to the restrictions, rights and privileges embodied in the Stowell deed of 1897 to Hoy, and are therefore a part of said deeds and enforceable against appellees; that appellants, as riparian owners, have a natural right to have the shore line of the lake and its expanse of water remain as it was by nature.

Numerous questions are raised by the parties and elaborately discussed in the briefs, but we are of opinion the rights of the parties depend upon two questions: (1) Were the covenants and restrictions in the deed from the Stow-

ells to Hoy binding upon appellees? (2) If they are, were appellants guilty of such *laches* as to estop them in equity from interfering with the work of filling in the lake by appellees?

Repeating some of the facts, the title to the property was prior to 1897 in the Stowells. In October, 1897, they sold and conveyed to Fremont Hoy 500 feet square of Prospect Point. The east, west and south lines of the tract conveyed were in the bed of the lake, some distance from the shore. The deed from the Stowells to Hoy recited that if the grantors fail "to insert the restrictions as above set forth in any and all deeds, leases, transfers and agreements as aforesaid, or in case of a breach * * * of any of the matters or things to which they have obligated themselves as aforesaid, it shall be deemed and held as a waiver of the restrictions * * * and said restrictions shall immediately become and be null and void." December 1, 1898, the Stowells conveyed to Field property adjacent to Crystal Lake and omitted the restrictions from the deed. Appellees assert, without arguing the point, that by the latter deed all restrictions in the deed to Hoy were waived and became null and void.

Even though the restrictions were waived by the Stowells by omitting them from the deed to Field, they were effectually renewed by appellees by reference to the covenants and restrictions in their deeds to appellants, so that the privileges of bathing, boating and fishing in all the waters of the lake owned by appellees were conveyed to appellants, with the covenant that the shore, and property adjacent thereto, would remain no less desirable for residence purposes. In the deeds to appellants, appellees conveyed the property "together with all the rights and privileges and being restricted by the requirements mentioned and embodied in a certain deed from Albert C. Stowell and Florence Dole Stowell, trustees, to a former grantor, Fremont Hoy, dated October 27, 1897," and recorded in the

recorder's office of McHenry county in book 96 of records, page 274. Substantially the same language is embodied in all the deeds under which appellants derived title from appellees. The privileges and restrictions in the deeds from the Stowells to Hoy were in that manner made a part of the conveyance by appellees to appellants as effectually as if they had been embodied in full in the deeds. It would seem to require the citation of no authority to support the proposition that if the deeds to appellants from appellees conveyed the privileges of bathing, boating and fishing in all the waters of the lake owned by the grantors, and if the grantors covenanted and agreed to do nothing that would render the shore or property less desirable for residence purposes, the deeds conferred rights upon appellants. It is true, the water near the shore where the fill was made is shallow, but appellees agreed by their deed that appellants should have the privilege of bathing, boating and fishing in all the waters owned by appellees, and they could not deny appellants that privilege by filling up a part of the lake. The fill made or being made by appellees extends out into the lake beyond what was the shore line when appellants bought, 50 to 150 feet, and to that extent the land previously covered by water extends further out in the lake immediately south of appellant's property and destroys what was the previous shore line at that point.

Much argument is devoted to the question whether at the time appellees sold to appellants the former made representations as to the shore line and the lake remaining in its then condition. In our view this is not very important and is certainly not controlling of the decision. The evidence on that question was highly conflicting. Appellees made a plat of the subdivision of the property at Prospect Point, a part of which they sold to appellants. They exhibited this plat to appellants before the sale. The plat showed the shore of the lake as it was when platted, with dotted lines of appellants' property extending into the bed

of the lake east to the 500-foot line of the tract called Prospect Point. The shore line extended southwesterly along the point. An attorney who had represented appellees previously in purchasing property but who represented appellants in purchasing their lots from appellees, testified that one of the appellants spoke about making the property beautiful and something was said by someone about the view. In his examination of the title the witness had noticed the very lengthy and severe restrictions. Samuels expressed himself emphatically that it was restricted property, and, as the witness remembered, said, "You have a beautiful view here," and something was said about the shore line. As the witness recalled, Samuels said in substance, "You can see from the plat where the shore line is and that it never can be changed by anybody to obstruct your view from what it is on this plat." The witness further testified that when he drew the contract he included all he understood to be the terms of the contract between appellants and appellees. We do not think that testimony is of great importance to either of the parties. Their rights are to be determined from the deeds we have referred to. If any importance is to be attached to that testimony it is that it shows the parties understood the property was restricted property and that the shore line could not be changed so as to affect its value for residence purposes. This, however, is the effect of the deeds independent of the talk of the parties at the time of making the sale.

Appellees contend that if appellants had an easement, as claimed, they are equitably estopped by their statements and conduct from obtaining relief by injunction. An equitable estoppel depends upon the facts of the particular case. The general rule is, that where a party by his statements and conduct leads another to do something he would not have done but for such statements and conduct, the guilty party will not be allowed to deny his utterances or acts to the loss or damage of the other party. (*Neidhardt* v.

*Frank,* 325 Ill. 596.) The party claiming an estoppel must have relied upon material acts and representations and must have had no knowledge or convenient means of knowing the true facts. (*People* v. *Chicago, Burlington and Quincy Railroad Co.* 290 Ill. 327.) Fraud is a necessary element of estoppel but it is not essential that there be a fraudulent intent. It is sufficient if a fraudulent effect would follow allowing a party to set up a claim inconsistent with his former declarations. Estoppel may arise from silence as well as words. It may arise where there is a duty to speak and the party on whom the duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent. (*Milligan* v. *Miller,* 253 Ill. 511; *Oliver* v. *Ross,* 289 id. 624.) It is the duty of a person having a right, and seeing another about to commit an act infringing upon it, to assert his right. He cannot by his silence induce or encourage the commission of the act and then be heard to complain. (11 Am. & Eng. Ency. of Law,—2d ed.—427, 428; 16 Cyc. 771-796.) Unreasonable delay, unexplained by equitable circumstances, has been declared evidence of acquiescence and will bar relief. (*Howe* v. *South Park Comrs.* 119 Ill. 101.) Unreasonable delay does not exist where the complainant waited until defendant launched his enterprise and committed the acts showing deception in his methods of procedure. *Johnson Manf. Co.* v. *Johnson Skate Co.* 313 Ill. 106.

Appellees conveyed the property to appellants between September, 1919, and June, 1923. Samuels testified that between 1920 and 1924 he had various conversations with Bondy about changing the shore line. In 1924 he told appellants that the following year he intended to secure a sand-sucking machine to remove the sand bar, blow it along the shore line, fill in the shallow water, bring the shore closer to the deeper water, make a nice beach and put a cement retaining wall around the beach; that Mrs. Bondy said appellants would spend dollar for dollar with Samuels

in doing this work; that early in 1925 he told Bondy he had decided to make the improvement, and he had been advised by his attorney that he had a legal right to do so but would have to secure a permit from the department of waterways. On September 16, 1925, Samuels made application for this permit, and a plat designating the extent of the fill was shown. Appellees visited appellants in their apartment in Chicago in October, 1925, and there was considerable conversation as to the nature of the improvement. Samuels testified that Mrs. Bondy asked him how much land she would gain in front of her lot and what it would cost. He told her she would gain approximately 50 feet at the point where her property joined the Samuels property and it would cost her between $800 and $1000. Shortly afterwards Samuels went to Bondy's office in Chicago and told him he had obtained a permit for the improvement. He testified he told Bondy the fill was not as large as he had hoped but it was substantial enough to make the improvement, and he drew a sketch showing Bondy its extent. On November 2, 1925, Samuels and Bondy went to the office of William F. Mulvihill, superintendent of the department of waterways, and had a talk with him relative to the fill in front of Bondy's property, and were informed that a permit to Bondy would be granted the same as the one given to Samuels. The next day Samuels assisted Bondy in preparing his application for the permit, which recited "that the line of filling in will join the one as outlined in the plat submitted to your department by Dr. Samuels and permit issued to him. You will kindly designate my line upon the plat of Dr. M. W. Samuels." The permit was issued to Bondy, but he never accepted it in writing or returned it to the department. After that permit was granted appellees proceeded with their plans. On December 7, 1925, Bondy called Samuels on the telephone and stated that he regretted he could not go ahead with the improvement—that Mrs. Bondy had changed her mind.

On December 15, 1925, Bondy wrote a letter to Samuels confirming this telephone conversation and stating that he would keep his permit from the division of waterways unsigned until he decided what was the best course to take. He thanked Samuels for his good will in the past and wished him success in all his undertakings. Bondy denied most of these conversations testified to by Samuels. He testified that he accompanied Samuels to Mulvihill's office merely to be a good fellow and accommodate a neighbor; that he had no interest in the conversation which went on there and took no part therein; that he never at any time intended to make that fill on his property. Early in April, 1926, the sand-sucker was installed and continued to operate until August 12, 1926, when the temporary injunction was issued. Appellants occupied their home at Crystal Lake in April, 1926, and remained there during the balance of the season. From their property they could see the work which was being done and they heard the sand-sucker in operation. On May 13, 1926, according to the testimony of Mulvihill, Bondy went to Mulvihill's office and told him that some of the people at Crystal Lake were making trouble for Samuels but Bondy was not in sympathy with these people in their efforts to stop Samuels; that he had decided not to go ahead, because he did not wish any trouble with his neighbors. Mulvihill testified that he showed Bondy, at that time, the plats and some of the complaints he had received from the neighbors, and stated that it was his opinion the best way to get rid of any nuisance was for all of the parties to get together and go ahead with the improvement on the basis of the permits issued. Muvihill testified that Bondy said that if Samuels went ahead in accordance with the permits it would be a benefit to the lake and he hoped Samuels would go ahead; that Bondy told Mulvihill the neighbors claimed Samuels was not living up to the terms of his permits. Mulvihill replied that he had sent a man to investigate this complaint and found that Samuels

had not violated the permits at any time. Mulvihill was corroborated in this testimony by his secretary, who was present at the time of the conversation. On June 22, 1926, Samuels received a letter from the attorney for appellants notifying him that they objected to the improvement on account of the reservations and conditions in the deeds; that they never consented to disregard the reservations and conditions and he objected to appellees disregarding them. At the time this letter was written the east and southeast sides of the shore line had been substantially completed, at a cost of about $4000. The bill for the injunction was not filed until August 7, 1926, when about $6500 had been spent.

It is contended by appellants that in the various conversations which they had with Samuels they thought he was only going to fill the holes and shallow places next to the shore line, and they did not understand the extent of the improvement until after the work was largely completed. There is considerable conflict in the evidence, but from the documentary evidence introduced and the testimony of disinterested witnesses we do not think this contention is sustained. The plats offered in evidence show the extent of the improvement, and the conversations with the officers of the department of waterways, who were disinterested witnesses, show that the extent of the improvement was discussed. The fact that appellants made application for a permit indicates that at the time the application was made appellants were willing to join in the improvement. If appellants understood the extent of the improvement at the time they had the various conversations with Samuels they are in no position to enjoin it.

It is insisted by appellants that appellees did not rely upon the representations and conduct of appellants but Samuels announced that he was going ahead with the improvement regardless of whether appellants did or did not join with him; that he was not misled by the statements or conduct of appellants, and therefore they are not estopped

from relief by injunction. It is doubtless true that Samuels thought he had a right, under his deeds, to make the improvement. He testified that he had been so informed by his attorney. The evidence shows, however, that from the beginning appellees consulted with appellants with reference to the improvement and asked them to join, and appellants agreed to join but later changed their minds because some of their neighbors objected and they did not want to have trouble with them. After Bondy notified Samuels by letter that he did not intend to proceed he did not make any protest about the prosecution of the work until a large part of it had been completed and a large sum of money had been spent, when for the first time he raised the question as to the right of Samuels, under the deeds, to make the improvement. In order to estop a party from enforcing a right it is sufficient that a fraudulent effect would follow by allowing him to set up a claim inconsistent with his former declaration. It is the duty of a person having a right and seeing another about to commit an act infringing upon it, to assert his right. He cannot by his silence induce or encourage the commission of the act and then be heard to complain. From December 7, 1925, until June 26, 1926, when the work was almost completed, appellants made no protest about the manner in which the work was being done or as to its extent. They not only seek to enjoin the further prosecution of the work but they seek a mandatory injunction to remove the work already done, which could only be accomplished at considerable expense to appellees. A prayer for relief by injunction is addressed to the sound discretion of the chancellor and the decree will be reversed only on account of its abuse. (*City of Kewanee* v. *Otley,* 204 Ill. 402.) An injunction is properly denied where the right of the complainant is doubtful. (*Labadie* v. *Morris,* 303 Ill. 321.) A mandatory injunction will be refused where the balance of conveniences is in favor of the defendant. (*Hill* v. *Kimball,* 269 Ill. 398; *Dunn* v. *Youmans,*

224 id. 34.) An injunction will be refused where the complainant has actively encouraged defendant to undertake the work and then has silently, without protest, permitted defendant to go ahead with the work in disregard of the right of complainant. *McGovern* v. *Brown,* 317 Ill. 73; *Curtis* v. *Rubin,* 244 id. 88; *Kneip* v. *Schroeder,* 255 id. 621; *Ewertsen* v. *Gerstenberg,* 186 id. 344.

Under the evidence appellants were equitably estopped from maintaining their bill, it was properly dismissed for want of equity, and the decree will be affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*

Mr. JUSTICE FARMER, dissenting:

This case involves two principal questions: (1) Whether the covenants and restrictions in the deeds forbade appellees making the fill or changing the shore line; and (2) whether appellants were guilty of such *laches* or conduct as to estop them in equity from interfering with the work of filling the lake by appellees.

As to the first question, I agree that the court very properly held the covenants and restrictions in their deeds forbade appellees making the fill and changing the shore line.

The opinion affirms the decree of the lower court on the ground that the injunction asked for was properly denied, not because the work was not in violation of restrictions and covenants in the deeds, but because appellants by their words, acts and conduct induced appellees to do the work at considerable expense. I do not understand the record shows that what appellees did they were induced to do by appellants. Appellee Samuels insisted all the time that he had a legal right to make the fill and change the shore line. He at first was of opinion that he would be required to obtain the consent of the division of water-

ways to do the work but subsequently found he was mistaken. He never at any time relied on the consent or acquiescence of appellants. In answer to an inquiry of one of appellants as to whether Samuels had the legal right to do that or not, he stated he had; that he had taken advice of counsel, and that he was going to go ahead and do the work regardless of whether anybody else joined with him in it or not. Previous to this talk there had been some talk of appellants, as well as other owners of land, about joining in the work of filling. Samuels testified that at one time appellant Mrs. Bondy said they would join him in making the improvements by improving their property, and said he told her he had already given the engineer instructions about the lines and the filling of the submerged land, "and that I did not depend upon her or anyone else in making my improvements but I was going ahead with those improvements whether she or anyone else joined in or not."

To my mind the proof shows, beyond dispute, that Samuels considered he was within his rights in making the fill and changing the shore line and that it was never intended by him to ask or obtain any consent or acquiescence of appellants. He claimed he had the legal right to make the fill and denied he was induced to do the work by the consent or acquiescence of appellants. That being true, there can be no element of equitable estoppel based upon the knowledge, consent or acquiescence of appellants. An equitable estoppel depends upon the facts of a particular case. The generally accepted rule is, that where a party by his statements or conduct leads another to do something he would not have done but for the statements or conduct of the other, the one guilty of the expressions or conduct will not be allowed to deny his utterances or acts to the loss or damage of the other party. The person claiming the estoppel must have been misled into such action by the other party and will suffer injury if the estoppel is not declared. The party claiming the estoppel must have relied upon the acts or representations of the

other and have had no knowledge or convenient means of knowing the true facts. Fraud is a necessary element. The party asserting the estoppel must have done or omitted some act which changes his position in reliance upon the representations or conduct of the other party. The representations must be concerning a material fact, and the party to whom they are made must be ignorant of the truth of the facts. If the element of fraud is wanting there is no estoppel. (*Knapp* v. *Jones,* 143 Ill. 375; *Washingtonian Home* v. *City of Chicago,* 157 id. 414; *Holcomb* v. *Boynton,* 151 id. 294; *DeProft* v. *Heydecker,* 297 id. 541; *Powers* v. *Wells,* 244 id. 558; *People* v. *Chicago, Burlington and Quincy Railroad Co.* 290 id. 327; *Gallagher* v. *Northrup,* 215 id. 563; 10 R. C. L. 697.) Appellees were not induced to incur the expenses of doing the work by being misled into believing that appellants had consented or would not object. Appellees entered upon and did the work under the belief that they had the legal right to do it and that it was not within the power of appellants to object. Their mistake was one of law and they were not misled by misrepresentation of the facts. If they were mistaken it does not raise an estoppel in their favor. *Finch* v. *Theiss,* 267 Ill. 65; *Holcomb* v. *Boynton, supra.*

Appellees contend the prayer for a mandatory injunction is addressed to the sound discretion of the court and was properly refused. The contention is that courts will consider the balance of convenience of the parties, and a mandatory injunction is properly denied where it is in favor of the person sought to be enjoined. A mandatory injunction will not usually be granted where the injury complained of can be substantially compensated by an action at law. Such an injunction is not favored, but in this case I am of opinion no action at law would be adequate. In a case where the offending party has not been misled as to the facts or induced by the other party to do the work he would not otherwise have done, the awarding of a mandatory

injunction is authorized. *Winhold* v. *Finch,* 286 Ill. 614; *Stewart* v. *Finkelstone,* 206 Mass. 28, 28 L. R. A. (n. s.) 634; *Steamboat Co.* v. *Starr M. P. Church,* 149 Md. 181; *City of Ocala* v. *Anderson,* 50 So. (Fla.) 572.

The proof shows the filling the lake and changing the shore line practically destroys appellants' property for the purposes for which it was sold to them. The damage can not be compensated adequately in an action at law, because the property is practically worthless for summer residence purposes with the fill and shore line changed. I am of the opinion the equities of the case are with appellants, and the decree should be reversed and the cause remanded, with directions to grant the relief prayed for in their bill.