## CO-ED ORIGINALS, Inc., v. MUTUAL GARMENT CO.

District Court, S. D. New York.

Sept. 18, 1944.

Shlivek & Brin, of New York City (Max Shlivek and Saul S. Brin, both of New York City, of counsel), for plaintiff.

Spencer A. Studwell, of New York City (Ralph Kalish and Alfred W. Petchaft, both of St. Louis, Mo., of counsel), for defendant.

KNOX, District Judge.

Plaintiff here sues to restrain an alleged infringement of the registered trade-mark "Co-Ed" (No. 75,933, November 30, 1909, renewed 1929), and to restrain what is charged to be unfair competition on the part of defendant.

Plaintiff claims that it, and its predecessors in interest, have continuously used the mark since 1909 when it was adopted by the dress manufacturing firm of Dallet and Weyl.

Defendant, since 1932, has engaged in the manufacture and sale of women's undergarments, commonly known as slips, and these are marketed under a mark which reads "Miss Co-Ed, by Wonder-Maid." Aside from the use of the word "Co-Ed" by each of the parties, there is no similarity between the two marks. That of plaintiff consists of the head and shoulders of a young girl clothed in an academic cap and gown, and enclosed in a more or less circular border. Beneath the border the words "Co-Ed Dresses" appear. Defendant's mark is limited to the words "Miss Co-Ed, by Wonder-Maid."

Plaintiff's mark is registered in "Class 39 Clothing" which includes "* * * outer garments of wearing apparel for ladies', misses' or children's use commonly known as costumes and comprising a waist part and a skirt part, such waist and skirt parts being separable or fastened together as in the case of a so-called 'princess dress or costume.' "

The history of plaintiff's mark is about as follows—

In 1909, Elsie Janis, a prominent actress of the day, played the leading role in a musical comedy that emphasized the activities of youth, and which was entitled "The Fair Co-Ed." The show was highly entertaining, and became a Broadway success. At about the same time, Dallet and Weyl were manufacturing a line of dresses that were designed to appeal, both to young ladies of college age, and to females who did not freely admit that, with the passage of years, their once sylph-like figures had become of matronly proportions.

In an effort to exploit their product, and having been inspired by the presentation of youth that Miss Janis made to the feminine adolescents of 1909, Dallet and Weyl adopted the name "Co-Ed" for use upon their goods. They also conceived the idea of presenting some of their garments to Miss Janis for use in her performances of "The Fair Co-Ed," and this idea was carried out. She, presumably glad to receive these additions to her wardrobe, wore them upon the stage, and thus made her contribution to advertising the business of the manufacturers. The trade-mark which had been given the dresses was then registered in the Patent Office.

The evidence is that Dallet and Weyl continuously used the mark until 1917, when Weyl died. The firm's business was put upon the market and in November of that year, it was purchased by a man named Finkenberg, who, according to Dallet, was more interested in procuring the trade-mark than in acquiring the firm's stock in trade. In order to accomplish his purpose, Finkenberg's corporation, Leo Finkenberg, Inc., assumed a lease with a lengthy unexpired term, and paid book values for the inventory and plant. Soon thereafter, at the instance of Finkenberg, the corporation of Dallet and Weyl, Inc., came into existence, and the assets formerly belonging to the firm of Dallet and Weyl, including the Co-Ed trade-mark, were transferred to the new corporation. From that time on until about January 31, 1922, the date of expiration of the lease of the premises in which the business was conducted, Dallet and Weyl, Inc., continued to make, sell and extensively advertise Co-Ed dresses.

On December 30, 1921, Co-Ed Dressmakers, Inc., was organized and took over the business enterprises of Leo Finkenberg, Inc., which theretofore had been conducted separately. Meanwhile, the latter corporation had made use of the trade-name "Co-Ed Dressmakers," and the recently created corporation renewed the trade-mark in its own name. In 1932, the company met with financial reverses and made an assignment for the benefit of creditors to Thomas O. Sheckell of the New York Credit Men's Association. He sold the assets in bulk to Co-Ed Dresses, Inc. Litigation ensued which was finally determined by the Appellate Division of the Supreme Court of New York, First Department, Sterling National Bank & Trust Co. v. Complex Dresses, Inc., 240 App.Div. 57, 269 N.Y.S. 110, and that court specifically found that the Co-Ed trade-mark had been transferred to Co-Ed Dresses, Inc.

From 1932 to 1940, the Co-Ed mark was used by its new owners in the manufacture and sale of its dress line and within such period, some 250 to 300 of its customers were granted exclusive franchises within their respective territories to handle the output of Co-Ed Dresses, Inc.

On February 1, 1941, Co-Ed Originals, Inc., was organized and is said to have acquired the Co-Ed trade-mark from Co-Ed Dresses, Inc. Finkenberg explains this action by saying that Berkeley Juniors, Inc., following an arrangement theretofore in effect between itself and Co-Ed Dresses, Inc., had planned to manufacture dresses for Co-Ed Originals, Inc., and to share substantially in such profits as might accrue. Due, however, to war conditions, Berkeley Juniors, Inc., could not furnish Co-Ed Originals, Inc., with the material and on a production scale such as were required, and as a result, the mark has not recently been used. It is asserted, however, that there is, and has been, no intention to abandon the same.

Co-Ed Dresses, Inc., during the period it engaged in business, spent large sums of money in exploiting the Co-Ed line of merchandise, advertising extensively in both fashion and trade publications, as well as in newspapers. These mediums, among others, included Vogue, Harper's Bazaar, Good Housekeeping, Pictorial Re-

view, Style and Women's Wear. Booklets and flyers, running into hundreds of thousands, were supplied to stores handling Co-Ed garments, and these in turn were distributed by dealers to customers. Indeed, it is said that over the past twenty years the owners of the mark have spent in the neighborhood of $1,000,000 in exploiting merchandise that carried the Co-Ed mark. Between 1922 and 1928, gross income from the business averaged about $1,250,000 per annum. Co-Ed Dressmakers, Inc., while it supplied the trade, did a business of more than $1,000,000 a year. That done by Co-Ed Dresses, Inc., and Co-Ed Originals amounted to $400,000 per annum. The mark obviously has acquired a substantial value, and such value—if the law permits—should not here be impaired.

Before going into the more hotly contested contentions of the respective parties, a word should be said concerning the business in which defendant is engaged.

Located at St. Louis, Missouri, and controlled by a man named Wittcoff, it has, since about 1930, engaged in the manufacture and sale of a type of feminine underwear, commonly known as slips, and these are distributed under the trade name of "Miss Co-Ed." It does an annual business of about $400,000 and its market covers a relatively wide territory. At no time has defendant made, or handled, women's dresses. It is apparent, therefore, that, so far as types of merchandise are concerned, there is no direct competition between the parties in interest. Plaintiff and its predecessors, it is true, in the manufacture of Co-Ed dresses of sheer material, supplies them with an inner garment that is intended to make its outer garments less transparent than they otherwise would be. Aside from this, the difference between plaintiff's product and that of defendant is wide and broad. Slips of present day manufacture, it would seem, are properly entitled to be classified as lingerie. Usually, they have about them a diaphanous daintiness and boudoir intimacy that are unpossessed by any outer garment, even though designed and tailored in an exclusive atelier of the Rue de la Paix. This is particularly so if the slip be made of laced linen, silk, or similar material. Furthermore, no modest woman would think of appearing publicly if clad only in a slip. This article of apparel is sometimes glimpsed if it happens to show beneath the hem of a skirt. But, when this occurs, and the wearer learns the fact, she is usually overcome by confusion and embarrassment. It is, therefore, reasonably safe to conclude that a sagging slip is due most often to carelessness or accident, and hardly ever to intention. On the other hand, when a woman, young or old, is attired in a well fitting and fashionably cut outer garment, she will readily appear in public, and take pride, self-satisfaction and pleasure in doing so. Thus, I am convinced that fundamentally, dresses and slips fall naturally into distinct and separate classifications. The difference between them, so far as their public display is concerned, is as great as that which is to be found between modesty and immodesty. These conclusions, I believe, are generally accepted by laymen, and that is the point of view of those who trade in women's apparel. Dresses and slips are seldom sold over the same counter, even in department stores.

Each of these items is of an individualistic character and is affected by exclusive manufacturing, styling and distribution factors. The two articles are in different price ranges; they are sold and distributed by different merchandising methods to such an extent that each garment should be treated as a specialty, and for the purposes of decision, I shall so regard them.

At this point, it will be well to say a word as to the nature of plaintiff's mark, and to reach a conclusion as to whether it is descriptive or fanciful, or an admixture of both.

To those of us who attended an educational institution that put its facilities at the disposal of both male and female students, the word "Co-Ed" is well and familiarly known. It is primarily descriptive of young women who are in attendance at such institutions, and emphasizes the attractive and unspoiled youth of "girls in their 'teen ages." This meaning would also seem to have been that which was in the minds of Dallet and Weyl, who derived the mark from a popular comedy that dealt with college life. Further proof that this is a fact is to be found in the use by plaintiff's predecessor of the slogan "For Young Women or Women Who Want to Stay Young." While Co-Ed garments have been made in large and small sizes—they were intended to serve a trade composed both of young women, and of those who as long as humanly possible, wish to avoid the appearance of mature years. In a very real sense, therefore, the mark is of a descriptive nature, and assuming that the

word "Co-Ed" can properly be used as a trade-mark for women's dresses, I am entirely certain that plaintiff should not be permitted to monopolize its use, and thus exclude others from applying a common dictionary word to articles of women's apparel that do not compete with plaintiff's goods.

While the action of the Patent Office, in granting and refusing trade-marks carrying the word "Co-Ed," has not been altogether consistent, it has, nevertheless, granted registration of such marks for use on items of women's apparel, such as leather belts, backcombs, hosiery, sanitary napkins, hats, corsets and shoes, to say nothing of cosmetics, toilet soap, cigarettes, wrist watches, and numerous other articles. The first mentioned, No. 72,005 antedated the registration issued to Dallet and Weyl. In Missouri, there is a dress concern incorporated under the name "Co-Ed Garment Company"; another in Illinois, known as "Co-Ed Frocks, Inc." Here in New York State, a women's glove business is carried on under the name of "Co-Ed Glove Company," and a manufacturer of misses' handbags uses the name "Co-Ed Bags, Inc.," while a ribbon house calls itself "Co-Ed Ribbons, Inc." In addition to this, the widely known chain stores of J. C. Penney Company, market women's and misses' millinery under the name "Betty-Co-Ed."

From all this, it is my opinion that plaintiff's use of "Co-Ed" should properly be limited to ladies' dresses. Pease v. Scott County Milling Co., D.C., 5 F.2d 524. Having about it nothing that is of a distinctive or original character, I cannot see why it should be treated differently than was the trade-mark "Blue Ribbon" which was dealt with in Pabst Brewing Co. v. Decatur Brewing Co., 7 Cir., 284 F. 110. See also France Milling Co. v. Washburn-Crosby Co., 2 Cir., 7 F.2d 304. Durable Toy & Novelty Corporation v. J. Chein & Co., 2 Cir., 132 F.2d 853.

Aside from the use of the word "Co-Ed" in the marks of both plaintiff and defendant, there is as previously said, no similarity between them, and one is not at all likely to be confused for the other.

Having concluded that defendant's mark does not infringe that of plaintiff, and that defendant has not been guilty of unfair competition, there is no present need to make a finding upon either the validity of plaintiff's mark or defendant's contention that plaintiff, by reason of lack of title, is without qualification to maintain this action.

Plaintiff's complaint will stand dismissed with costs.