## PABST BREWING CO. v. DECATUR BREWING CO. et al.

(Circuit Court of Appeals, Seventh Circuit.   September 12, 1922.)

No. 3080.

1. **Trade-marks and trade-names and unfair competition ⬤⟿61—"Blue Ribbon," as trade-name for beer, held not infringed by its use as trade-name for malt extract.**

   The name "Blue Ribbon," established by complainant as a trade-name for beer, *held* not infringed by its use as the trade-name of a malt extract, which can be used for making beer, and it appearing that the name, as a term denoting high merit, has been registered more than 60 times as a trade-name for various articles of commerce.

2. **Trade-marks and trade-names and unfair competition ⬤⟿32—Failure to use trade-mark for incidental purpose may affect equities.**

   Though failure of the owner of the trade-mark "Blue Ribbon," as applied to beer, to use the same as a designation for a malt extract may not affect his right to complain of an infringement, such act may have a bearing on the equities as against one using the name in connection with a malt extract, especially where complainant had manufactured a malt product under a different name.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Pabst Brewing Company against the Decatur Brewing Company and others. Decree for defendants, and complainant appeals. Affirmed.

The controversy is over the use of the trade-name "Blue Ribbon," as applied to a commercial product known as malt extract. For many years appellant Pabst Brewing Company, had registered and used this name on a certain make of its beer, and established for it so wide a trade that it might well be said that the term "Blue Ribbon" as applied to beer had acquired a secondary meaning indicating the Pabst beer.

Appellee Brewing Company had long operated a brewery at Decatur, Ill., but, having discontinued operations, it handled for Pabst its beers, including the "Blue Ribbon" brand, for Decatur and vicinity, until such time as manufacture and sale of beer was prohibited. In February or March, 1919, appellee began to put out a malt extract under the name of "Blue Ribbon," and soon acquired for it a very considerable trade, and it then secured Patent Office publication "Blue Ribbon" as its trade-mark for malt extract. It had communicated with appellant, stating its intention to use the name in connection with such product, and thereafter appellant objected to its use, claiming it alone had a right to use it with such product. Up to that time, however, appellant's use of the name had been in connection with beer only, and, subsequent to prohibition, with its near beer. It had put out a malt extract under the name of "Frementone," and a very similar, if not wholly identical, product—malt syrup—under the name of "Purity." But, some weeks after appellee began marketing malt extract under the "Blue Ribbon" name, the Pabst Company applied the name to certain of its malt syrup, although there is evidence of their manifestation of intention to do so sometime before. The evidence, however, requires the conclusion that, as between these parties, appellees were the first by several weeks to apply the name to a malt extract or syrup.

The product is prepared by malting grain, generally barley, and in the course of its preparation it becomes the "wort," or malt liquor, which is an important ingredient of beer. In this state it contains about 80 per cent. of water, and the extract or syrup is produced by reducing the water content to about 20 per cent.; the result being a thick, viscous, syrupy substance, largely sugar, and having the distinctive malt flavor. Some difference in temperature is said to make the product either extract or syrup.

The evidence shows that, since national prohibition, there has been a very large increase in the manufacture of this product, the far greater part of it being used in the making of so-called "home brew" beer; but it is also used in much the same way as glucose and ordinary syrup for baking and in making confectionery, this being substantially its entire use prior to prohibition. For the general retail trade, it comes packed in two-pound tin cans, like the ordinary friction top syrup can, with labels containing such brands or devices as the maker or seller may attach. Many others than these parties are engaged in its production.

The District Court found that the product did not fall within the general character or classification of beer, for which appellant had secured its trademark and established its reputation and trade, and that there was no likelihood of confusion of appellee's product with that of appellant, and denied appellant the relief it sought against appellee, dismissing the bill for want of equity.

Geo. A. Chritton and Max W. Zabel, both of Chicago, Ill., for appellant.

Luther Johns and Arthur E. Wallace, both of Chicago, Ill., for appellees.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). In the voluminous legal literature submitted by way of briefs and arguments, there is again reviewed the numerous adjudicated cases on trade-marks and kindred subjects; appellant emphasizing such as exhibit the wider range of coverage of a given trade-name, and appellee those wherein the protection accorded appears less inclusive. So often have such cases been collated, compared, and distinguished that it is apprehended no useful purpose would be served by here repeating the process. As to general principles involved, there is little, if any, dispute; but their application to specific facts and conditions is at times confusing, and has led to results not always reconcilable.

[1] The product in question is in no sense a beverage; it is at most usable as one of the ingredients of a beverage, which, when produced, would most likely be such as now falls under the ban of the law. Prior to prohibition, there was little or none of the present notoriously prevailing practice of making "home brew." If persons wanted beer, they would go out and buy it; and if nowadays they desire the product called "near beer," they go into the market and purchase such make of it as they wish. It is not supposable that persons would trouble themselves to procure the ingredients for near beer and make it at home. It may well be assumed that, in so far as this product is employed as an ingredient for making any beverage, it is the real, old-fashioned, alcoholic beer, and it is not apprehended that its use for such purpose can in any manner conflict with anybody's lawful trade therein.

If the actual use of the product were for purposes other than as an ingredient of an alcoholic beverage, it is not readily conceivable how its exploitation for such use would to any appreciable extent conflict with or injure appellant in its trade in any product, which, during all the years preceding, it had made and sold under the trade-name of "Blue Ribbon."

[2] While it is not in all cases essential to the protection of one's right to a trade-name that he shall have made actual use of it in connec-

tion with the various products of the same general nature as that with which he has distinctly associated it, nevertheless a failure so to do may have bearing on the equities in a controversy such as this. If the appropriation of "Blue Ribbon" in connection with beer carried with it the right to use it in connection with a malt extract or syrup, it is significant that appellant employed other names for marketing those products, and did not avail itself of the asserted large advantage which would accrue to it through applying to that product this well known name of its beer. Its activity in this direction did not seem to be greatly aroused until appellee gave evidence of building up some trade on the extract, which, it may be fairly inferred from the evidence, came as the result of extensive advertising of the product as an ingredient for "home brew," rather than because of any particular brand or label on the cans.

Shortly after this cause was decided in the District Court, a case was heard in the Southern District of New York, involving the use of the name "Budweiser" as applied to malt extract; the complaining party being the Anheuser-Busch Brewery, which under such name had built up a great trade for its beer. Anheuser-Busch v. Budweiser Malt Products Corp., 285 Fed. ——, decided Sept. 27, 1921. In the opinion there, Judge Mack stated he was bound to follow the Circuit Court of Appeals of the Second Circuit in Aunt Jemima Mills Co. v. Rigney & Co., 247 Fed. 407, 159 C. C. A. 461, L. R. A. 1918C, 1039, where it was held that a trade-mark for pancake flour would be infringed by one employing the trade-mark on a syrup. But, commenting on the case at bar and the opinion of Judge Carpenter therein, it was stated:

"It might, however, well be contended that the term 'Blue Ribbon' is not necessarily so distinctive as 'Budweiser.'"

Outside of the beer industry, the name "Budweiser" had no significance whatever in this country, and then only as applied to the Anheuser-Busch product. It is as arbitrary as though it were "XYZ." The term "Blue Ribbon," on the contrary, had long acquired special significance, wholly apart from its use as a trade-name for any product. The Century Dictionary says it is employed to indicate membership in total abstinence organizations. Surely it was not this application which induced its employment as a trade-name for beer. A further definition given is that it signifies high merit, as indicating first prize for excellence at an exhibition or contest. It is in this long and well understood sense that it has been so very much used as a trade-name for articles of commerce. It was shown to have been registered in the Patent Office over 60 times, some of the several registrations being for whisky, wine, vinegar, flavoring extract, candy, chewing gum, chocolate, flour, bread, cigars, chewing and smoking tobacco, citrus fruits, fresh grapes, fresh deciduous fruits, and canned fruits. Such registrations at different times and to different persons would indicate that the Patent Office did not recognize a large measure of inclusiveness in the name. Indeed, after appellant's registration for beer, it twice made publications for malt extract—once in 1907, which use, at the demand or request of appellant, was abandoned, and again to appellee, the right to which, as against appellant, is here in controversy.

In view of the very wide and general employment of "Blue Ribbon" as a trade-name, we believe the District Court properly concluded that appellant's right to use it was limited to its registered product, and whatever other first use it made of it, and that in appellee's use of it there was no likelihood of any confusion of its product with that of appellant.

We find nothing in the record which requires the conclusion that (apart from the controversy respecting the trade-name) appellee was guilty of unfair trade practices toward appellant.

The decree of the District Court is affirmed.