## DWINELL–WRIGHT CO. v. WHITE HOUSE MILK CO., Inc.
### No. 40.

Circuit Court of Appeals, Second Circuit.
Jan. 4, 1943.

---

Before L. HAND, CHASE, and FRANK, Circuit Judges.

Frederic R. Twelvetrees, of Buffalo, N. Y. (Charles R. Fenwick and Edward G. Fenwick, both of Washington, D. C., of counsel), for appellant.

Munn, Liddy & Glaccum, of New York City, and Feldman, Kittelle, Campbell & Ewing, of Washington, D. C. (Sylvester J. Liddy and Orson D. Munn, both of New York City, and Sumner S. Kittelle, of Washington, D. C., of counsel), for the appellee.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment dismissing its complaint after a trial in an action to enjoin the infringement of its trade-mark, "White House." It has used this mark, coupled with a picture of the White House in Washington, continuously since 1888 in the sale of coffee throughout the United States, and since 1910 in the sale of tea; in that year it secured two registrations of both mark and picture; one for coffee, the other for tea. The defendant's user began in 1917 by a Wisconsin corporation, first called the White House Milk Products Company, and later the White House Milk Company. This company sold out the business to a subsidiary of the Great Atlantic & Pacific Tea Company in 1922, which in turn sold to the defendant, another subsidiary of the Tea Company, in 1935. Throughout this time and until the filing of the complaint in 1940, the user has been continu-

ous, but confined to canned evaporated milk. The mark has always been the same as the plaintiff's—"White House"—and with it since 1927 the defendant or its predecessor has coupled a picture of the White House exactly like the plaintiff's. The plaintiff has never sold milk; neither the defendant nor any of its predecessors has ever sold tea or coffee; and the action must rest, as indeed it does, upon the well established principle that the owner of a mark may protect its use upon goods other than those which he himself sells, provided they are not too different from his.

The defense is in substance that the defendant has built up its business upon the faith of the plaintiff's implicit assurance that it had no grievance. The facts on which this depends are as follows. The use of the mark upon milk first came to the plaintiff's notice in 1920 through one of its salesmen. At that time the Wisconsin business was three years old and amounted to about 300,-000 cases of milk a year. The mark was adopted in ignorance of the plaintiff's mark. The plaintiff made no protest in 1920, preferring, as it said, to let the situation develop, expecting that the business might disappear. Eight years later, in 1928, it had not done so but on the contrary after having been conducted by the Tea Company's subsidiary for six years, it had grown to nearly 150 million cans. In that year the plaintiff began to sell its coffee in quantity to the Tea Company; and at an interview between its general sales manager and its eastern sales manager and the Tea Company's purchasing "supervisor," it suggested that the Tea Company "make up a combination of White House coffee and White House evaporated milk." This the "supervisor" refused because the Tea Company had its own coffee to sell; but he nevertheless agreed to push the sale of the plaintiff's coffee among the company's distributing agencies. The plaintiff continued selling coffee to the Tea Company until just before this action was begun, by which time the milk business had grown from 150 million cans in 1928 to 272 million. Meanwhile on the 4th of September, 1935 and again on the 29th of January, 1936, the plaintiff entered into a contract with the Tea Company agreeing to allow five per cent discount upon its sales of coffee "for advertising and for distribution service." Throughout the period it not only knew that the Tea Company was advertising milk under the

"White House" mark, but that in some cases it was actually grouping "White House" milk and "White House" coffee in the same format. The sale of milk appears to have gone along without doing the plaintiff any injury until 1930, when the Tea Company cut the price below that of other standard brands, a competition which independent grocers could not meet. This, added to what was probably an already existing hostility to "chain stores," angered these grocers, who, in retaliation cut their purchases of "White House" coffee, supposing that it, like the milk, was one of the Tea Company's products. Still the plaintiff made no protest until May, 1936, when it filed a proceeding in the Patent Office to cancel the defendant's registered mark, in which it was eventually successful in May, 1940. 111 F.2d 490, 27 C.C.P.A., Patents, 1194. Even this proceeding was not strictly a protest against the defendant's use of the mark, but rather against its effort to monopolize it in the milk market; nevertheless, we shall take it as a protest, for the defendant probably understood that, if its mark was once successfully challenged, the plaintiff would follow with a demand that its use should be discontinued; and in fact this suit followed close upon the termination of the cancellation proceeding. The judge apparently assumed the original validity of the plaintiff's claim to relief, but held that it had lost its rights by an acquiescence on which the defendant had relied.

Whenever a newcomer invades another's market by the use of the other's mark, every sale is a separate wrong. True, it does not inevitably follow that the customer secured would have bought of the mark's owner, but if the newcomer adopts the mark for that purpose, or continues to use it without excuse after he learns of the mark, he will not be heard to say that his effort may be unsuccessful. The wrong is therefore really a series of wrongs, and delay alone can never be more than a partial defense; it will bar any redress for those wrongs which have happened before the period of limitation, but it will never bar redress for any others, past or future. McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828; Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526. This has at times been said to be because infringement of a trade-mark is a "fraud," but it is hard to see what is gained by interjecting that idea, and indeed it is not accurate to do so, for delay alone is.

as bad a defense when the newcomer's past user has been innocent as when it has been guilty. He must show some reason why it will not be just to stop him. That he may of course do, if he has acted upon the actual consent of the owner of the mark, or if the owner has abandoned it—and that may at times appear by inaction continued long enough. Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60. But those are not the only possible defenses; the owner may have so conducted himself as impliedly to assure the newcomer that he does not object, and the newcomer may have built upon that assurance. Prince Metallic Paint Co. v. Prince's Manufacturing Co., 3 Cir., 57 F. 938, 944; Thomas J. Carroll & Son Co. v. McIlvaine & Baldwin, 2 Cir., 183 F. 22; Landers, Frary & Clark v. Universal Cooler Corp., 2 Cir., 85 F.2d 46; Proctor & Gamble Co. v. J. L. Prescott Co., 3 Cir., 102 F.2d 773, 781; Emerson Electric Manufacturing Co. v. Emerson Radio & Phonograph Corp., 2 Cir., 105 F. 2d 908; National Fruit Products Company, Inc., v. Dwinell-Wright Co., D.C., 47 F. Supp. 499. No doubt it is harder to establish this defense when the newcomer originally sets out to pass off his goods; conceivably indeed, in the face of deliberate and continued palming off, not even the owner's assurance will be a defense although our language in Landers, Frary & Clark v. Universal Cooler Corp., supra, 85 F.2d at page 49, should not be understood as definitely so holding.

■ If however the question comes up, not when the newcomer is actually competing in the owner's market, but when, as here, he is selling goods which the owner has never sold, though they are like enough to make people think him their source, the determining considerations are different. The owner's only interest in preventing such a use of his mark is because he may wish to preempt the market for later exploitation, or not to expose his reputation to the hazard of the newcomer's business practices, or both. As we said in Emerson Electric Manufacturing Corp. v. Emerson Radio Phonograph Corporation, supra, these interests yield much more readily to any conflicting interests of the newcomer than when he invades an existing market. See Judge Wyzanski's scholarly discussion of the whole subject in National Fruit Products Co., Inc. v. Dwinell-Wright Co., supra, 47 F.Supp. 499.

The right to preempt is a very slender thread indeed; protection to reputation is more substantial, it is true, though even that may perhaps to some degree be measured by what the newcomer's practices have been and are likely to be. On the other hand, the newcomer always stands in a much less vulnerable position, because, while it is prima facie indefensible ever deliberately to copy another's mark even in a non-competing market, it is nothing like so reprehensible as to cheat him out of his customers by pretending that one is selling his goods. Here, as often, equity does not seek for general principles, but weighs the opposed interests in the scales of conscience and fair dealing. What would be no excuse for invading another's territory may well serve in the struggle for a hinterland or sphere of influence; from such an occupation it would be utterly unfair to oust one who has actually entered in reliance upon the other's consent. The owner's rights in such appendant markets are easily lost; they must be asserted early, lest they be made the means of reaping a harvest which others have sown.

■ We agree with the judge that it would be unjust to deny the defendant its right to use the mark in selling milk. From the first moment when it learned of the Wisconsin Company's use of the mark down to 1936—sixteen years—the plaintiff did nothing to stop that use; it merely stood aside and watched the business grow at great cost to colossal proportions. That alone would make us hesitate to intervene; but it is far from the measure of the plaintiff's implied assurance. When it began to deal with the Tea Company in 1928 it affirmatively suggested the joint sale of milk and coffee under the same mark; after the Tea Company had refused this, it contributed to the joint advertising of both, and continued to do so for eight years, during which the milk business continued to grow. Even in 1930 when for the first time it began really to be injured, it did nothing; not a word of protest, or gesture of complaint, escaped it for six years more; and still the milk business kept increasing. What equity it can have the hardihood now to assert; how it can expect us to stifle a competition which with complete complaisance, and even with active encouragement, it has allowed for years to grow like the mustard tree; why we should destroy a huge busi-

ness built up with its connivance and consent: this we find it impossible to understand.

There is but one feature of the controversy which is even open to debate. The picture of the "White House" which the plaintiff uses is plainly not a photograph, but a composition; and the defendant's is so like it down to the minutest detail that it is impossible to doubt that, when the Tea Company's first subsidiary began to use it in 1927, it copied the original. Even so, we are not disposed to interfere. This is not an action for the infringement of copyright; it is a trade-mark suit, and, believing as we do, that the defendant has the right to use a picture of the White House in selling its milk, we cannot suppose that the particulars plagiarized give any appreciable added support to the belief that the plaintiff is the source of the milk, beyond what a new and originally composed picture would give. Besides, even though it does add a trifle, the plaintiff knew of the picture along with the mark; it was as content with the detail, as it was with the ensemble; they should stand or fall together.

Judgment affirmed.