CONSUMERS PETROLEUM CO. v. CONSUMERS CO. OF ILLINOIS.

No. 9407.

Circuit Court of Appeals.

Seventh Circuit.

July 16, 1948.

Rehearing Denied Aug. 19, 1948.

MINTON, Circuit Judge, dissenting.

————◆————

Harry G. Hershenson, James B. McKeon, Albert E. Jenner, Jr., and Edward H. Hatton, all of Chicago, Ill. (Hershenson & Hershenson and Poppenhusen, Johnston, Thompson & Raymond, all of Chicago, Ill., of counsel), for appellant.

Joseph B. Fleming, Carl S. Lloyd, Lloyd M. Bowden, and Kirkland, Fleming, Green, Martin & Ellis, all of Chicago, Ill., for appellee.

Before MAJOR and MINTON, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This action was brought by Consumers Petroleum Company against Consumers Company of Illinois to enjoin the latter from employing the name "Consumers" in the business of marketing fuel oils in the Chicago metropolitan area, and for an accounting. Plaintiff was incorporated under the laws of the State of Illinois on December 28, 1925, and was authorized to "buy, sell, manufacture, and deal in petroleum and its by-products * * *." Since that time it has been engaged in the business of marketing petroleum and its by-products, particularly fuel oils, on a large scale in the Chicago and Cook County areas under the name "Consumers" and its corporate name "Consumers Petroleum Company," as trade names.

Defendant was incorporated under the laws of the State of Delaware in 1937, and was authorized "to buy, sell, and generally deal in and trade with at wholesale and retail, import and export, coal, coke, wood and other fuel or combustible material of every nature and description." Defendant was incorporated subsequent to and as a result of a corporate reorganization proceeding instituted in the United States District Court in March, 1941, in which an Illinois corporation by the name of Consumers Company was the debtor. The plan of reorganization directed the trustees to convey, assign, transfer and deliver all of the assets of the debtor corporation, "including good will and the right to use their respective corporate names," to the new corporation to be organized. On February 27, 1937, the trustees by assignment in writing sold, assigned and quit claimed all of the property and assets of the debtor corporation and its subsidiaries to defendant, including "trade marks, trade names, inventories, inventions and good will, together with any right to use the respective corporate names of the assignors."

Defendant's predecessor (sometimes referred to as the old or original Consumers Company) was organized in 1913 as the result of a merger of the Knickerbocker Ice Company with the City Fuel Company. The former was engaged in the ice business and the latter in the coal business. It was authorized "to deal at wholesale and retail in coal, coke, wood and other fuel of all kinds, * * * and engage in the * * * sale of all articles connected with the business of dealing in coal and other fuel."

The theory of the plaintiff embodied in its complaint and argument is that it has continuously engaged soley in the business of selling and distributing fuel oil in the Chicago area since 1925, the date of its incorporation, under its trade names of "Consumers" and "Consumers Petroleum Company," and during such time it has spent large sums of money in promoting and advertising its business under such trade names, and having first utilized said names in such business, it is entitled to their exclusive use in connection therewith. Further, it is claimed that the defendant subsequently appropriated the trade name "Consumers" in the sale and distribution of fuel oil and that as a result the public has been confused by such use, which constitutes unfair competition and resultant damages to plaintiff's business, good will and reputation. The defendant denies that it wrongfully appropriated the trade name "Consumers" in connection with the sale and distribution of fuel oil; in fact, its theory is that it had a right to utilize this trade name in connection with the sale of fuel oils since the incorporation of its predecessor in 1913, and that the appropriation of such trade name by plaintiff in 1925 was wrongful. Defendant does not contend that it was engaged in the fuel oil business in 1925, but, as alleged in one of its counter-claims, that the plaintiff from the inception of its business has "been charged with knowledge that Consumers Company, defendant's predecessor, might at any time commerce to sell fuel oils in addition to coal, coke and other fuel."

Confusion on the part of the buying public as between plaintiff and defendant as to the source of fuel oils purchased or sought to be purchased was charged in both the complaint and in defendant's counter-claims. Each side, however, disclaims responsibility for the confusion and each asserts that it was the result of the wrongful act of the other in appropriating and using the trade

name "Consumers" in connection with the sale and distribution of fuel oil.

A Master in Chancery to whom the cause was referred heard and considered a large amount of both oral and documentary evidence, made a voluminous report, thoroughly analyzed the pleadings, the theories of the respective parties, the law applicable thereto, and recommended that the issues be decided in favor of the plaintiff and against the defendant. On exceptions to the Master's report, the court refused to follow the Master's recommendation, adopted its own findings of fact and concluded as a matter of law that the defendant had a right to engage in the fuel oil business on its own account under its corporate name, and that neither this nor any other act of defendant constituted unfair competition with plaintiff; that each party was guilty of laches so as to bar all relief sought by each party against the other; that plaintiff was also barred by estoppel; that the theory of damages adopted by the Master was without foundation in law or fact; that plaintiff was in equity with unclean hands; that neither party was entitled to relief, and that the complaint and counterclaims should be dismissed.

■ Some of the numerous questions presented may be disposed of in summary fashion. Jurisdiction was based upon diversity of citizenship. The court expressed the view that it was without jurisdiction because the requisite amount was not involved. Neither side attempts to support this view as to want of jurisdiction, and we think it was erroneous. Moreover, the court, while expressing this view as to lack of jurisdiction, proceeded to decide the case on its merits.

■ Plaintiff attempts to differentiate between the rights of the defendant with reference to the use of the trade name in controversy and that of its predecessor corporation. Hazelton Boiler Co. v. Hazelton Tripod Boiler Co., 142 Ill. 494, 504, 509, 30 N.E. 339, is cited in support of this contention. The wording of the assignment in the Hazelton case is quite different from that in the instant case and is readily distinquishable. In our view, defendant by the assignment acquired the same right, no more and no less, to use the trade name "Consumers" as that possessed by its predecessor. In other words, the defendant stepped into the shoes of its predecessor insofar as the right to its use was concerned. We shall, therefore, treat the situation as though defendant had been in existence from the date of the incorporation of its predecessor.

A question much discussed involves the effect to be given Rules 52(a) and 53(e) (2) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, inasmuch as the District Court has made findings of fact in some respects inconsistent with those made by the Master. We think there is no occasion to discuss the effect which should properly be given these rules because, as we view the matter, the result reached by the court, contrary to that of the Master, was occasioned in the main by the application of different principles of law.

The Master found:

"Shortly after its formation, Consumers Company [defendant] began to sell solid fuels to the public in and around Chicago, and * * * sold, among other things, petroleum carbon, the residue remaining after gasoline has been distilled from crude oil but it did not start to sell fuel oil to domestic consumers because it was not until about the year 1922 that the domestic oil burner was sufficiently perfected to permit of its efficient and economical use in homes, although one type of oil burner had been available since 1919. During all this period and continuing until the present time, Consumers Company has spent large sums of money in and about advertising the products it offered for sale, for the purpose of building up a good will for these products. It has built up a very valuable good will."

The findings relate that in November, 1925, there were listed in the Chicago telephone directory 55 concerns bearing the name "Consumers" and doing business in the Chicago area. The Master also found:

"After making due inquiry and ascertaining that Consumers Company was not in the business of selling oil, Mr. Schurman [plaintiff's president] chose the name Con-

sumers Petroleum Company and incorporated his company on or about December 28, 1925, under the laws of the State of Illinois. * * * Shortly, thereafter, it began selling fuel oil in and around Chicago. It acquired a bulk plant and bought and operated trucks. * * * Since its incorporation and continuing until the present time, Consumers Petroleum Company has spent large sums of money in and about advertising the products it offered for sale, for the purpose of building up a good will for those products. It has built up a very valuable good will."

The Master further found:

"Commencing in 1927, Consumers Company [defendant] began advertising the sale of fuel oil for domestic users and began the solicitation of orders therefor. These orders were filled by the Standard Oil Company of Indiana which delivered oil refined by it and sold under the names of 'Stanolind,' and 'Stanolex.' "

Subsequent to the reorganization proceedings and after the defendant was organized as a Delaware corporation, the Master found:

"Defendant continued to carry on its method of selling fuel oils as it had done since 1927. Commencing in 1938, Consumers Company of Illinois changed its method of doing business insofar as fuel oils are concerned. It stopped soliciting orders for 'Stanolind,' and 'Stanolex,' and the Standard Oil Company of Indiana no longer made deliveries for it. * * * Shortly after this, defendant for the first time acquired one or more bulk plants and rented trucks for the delivery of fuel oils. These trucks bear the name 'Consumers Company' * * *."

The Master further found:

"The undisputed evidence shows that prior to the year 1938, when defendant began the sale of fuel oil for itself—i. e., it stopped acting as agent for the Standard Oil Company of Indiana—there was no confusion in the minds of the public despite the similarity of names. It shows further that since that time there had been very considerable confusion. Not only is this evidence not denied but allegations to that effect constitute the bases of the pleadings

of each of the parties and this confusion should, for the protection of the public, not be permitted to continue."

We find nothing in the findings of the District Court in conflict with or which impairs the findings of the Master just stated. Thus, we have a factual situation wherein the defendant from the time of its incorporation confined its business solely to the distribution of hard fuels such as coal and wood until 1938, when it commenced the sale and distribution of fuel oil on its own account. In the meantime, plaintiff in the year 1925 was incorporated and engaged solely in the business of the sale and distribution of fuel oils. Further, as found by the Master and not disputed, each of the parties spent large sums of money in advertising their business and each built up a good will for their business and especially for those products with which they were concerned. In this connection, it must be kept in mind that while the defendant subsequent to 1927 advertised fuel oil to a limited extent, it made no sales of such oil under its corporate name until 1938. In the meantime, such fuel oil as it dealt with was under the trade names of the Standard Oil Company.

In connection with this factual situation, it is also pertinent to note that defendant's fuel oil business even as agent for Standard Oil was an infinitesimal part of its business. The average gallonage per year for the eleven year period, 1927 through 1937, was 186,056 gallons, as contrasted with plaintiff's business of 600,000 gallons in 1926, which had gradually increased to 9,000,000 gallons in 1936. The record also shows convincingly that the defendant did not seriously consider itself in the fuel oil business prior to 1938. No mention was made of the fuel oil business in statements and reports to its stockholders during the years 1927 to 1937. There was introduced in evidence by the defendant Exhibit 201, which is dated July 31, 1936, and entitled, "Project For The Immediate Expansion Of Fuel Sales Through The Acquisition Of The Consumers Petroleum Company." The authorship of this document is in dispute, but it was introduced by the defendant and the Master found that it "appears to have been prepared by some person associated with defendant's predecessor." The pros-

pectus refers to the success which other coal companies have had in adding fuel oil to their business. It points out that the trend is to fuel oil and that "A great advantage of purchasing a going concern, is the avoidance of price wars to gain customers." As ·to the plaintiff company, it stated: "The Consumers Petroleum Company controls six dealer gasoline filling stations. They represent desirable and profitable business, in more ways than one. They yield good profit, directly; in addition, they afford summer use of trucks; assist in retaining plant employees on year round basis. They could be the nucleus of a much greater number of stations. These, under our name, would capitalize our city wide reputation and easily enable us to sell millions of gallons of gasoline to our regular fuel customers. * * * The Consumers Petroleum Company has steadily retained about 88% of its customers. It has constructively added to them by converting coal users to fuel oil, through sale of its Ace Rotary Oil Burner. * * * The Consumers Petroleum Company has always made a profit on operations. * * * Present truck delivery costs of the Consumers Petroleum Company are at an enviably low figure. Partly, this is due to the splendid central location of the plant, and partly, to excellent plant management. The most modern oil plant in the city of Chicago will be secured."

The prospectus concluded: "In conclusion, the Consumers Petroleum Company has been in successful operation for twelve years; has invariably shown a profit; is conservatively managed by its owner who is competently assisted by a well qualified, compact staff; has grown consistently; and has expanded its facilities progressively and in tune with—if not in advance of—the trends in fuel oil. Its acquisition by us would be wise and profitable."

A critical question is whether fuel oil which the plaintiff commenced selling in 1925 is a property of the same general class or description as the solid fuels such as coal and wood which the defendant was selling at that time. Much of the argument revolves around this question. In fact, defendant's contention is predicated on the theory that fuel oil and hard fuels are of the same general descriptive class and that the defendant having first adopted the trade name "Consumers," plaintiff wrongfully took such trade name when it commenced its dealings in fuel· oil in 1925. On the other hand, plaintiff contends that fuel oil and hard fuels are not of· the same general descriptive class and that it had a right to apply such trade name to its fuel oil business.

The defendant, in support of its contention, cites the single case of Harlan-Wallins Coal Corp. v. Transcontinental Oil Co., 64 F.2d 122, 20 C.C.P.A., Patents, 944, which involved a contest over the registration of a trade mark between a coal company and an oil company. True, it was there held that fuel oil and coal are goods of the same descriptive properties. We are not impressed, however, with the pertinency of this holding as it relates to the instant case.

This court quite recently, in California Fruit Growers, et al. v. Sunkist Baking Co., 7 Cir., 166 F.2d 971, 973, held:

"Fruits and vegetables are not in the same general class of merchandise as bread, nor are they goods of the same descriptive properties as bread. About the only things they have in common are that they are edible and are usually sold in the same class of stores to the same class of customers."

We think it is equally true that the only thing in common between coal and fuel oil is that they are both used for heating purposes and in recent times have been sold by the same class of dealers to the same class of customers.

In France Milling Co., Inc. v. Washburn-Crosby Co., Inc., 2 Cir., 7 F.2d 304, 305, the court held that "straight" wheat flour and "prepared" flours were not· of the same goods or class of commodities. In so holding, it stated:

"Classification of any commercial article depends far more on commercial custom than upon the inherent nature of the product. Dog biscuit and pilot bread are closely allied in physical origin, and so are guncotton and calico, but in commercial classification they are poles apart. The difference between 'straight' and prepared flours is not so great as in the illustration given,

but that as commercial commodities they are different is in our opinion plainly shown * * *."

█ The word "consumers" is a common word and such a word affords only a limited protection in contrast with arbitrary, fanciful and distinctive words. For a discussion in this respect, see Arrow Distilleries, Inc. v. Globe Brewing Co., 4 Cir., 117 F.2d 347, and Philco Corp. v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663.

In Pabst Brewing Co. v. Decatur Brewing Co., 7 Cir., 284 F. 110, this court held that malt extract and beer were not of the same descriptive qualities and general class of merchandise. The conclusion was based in part at least on the premise that there was no likelihood of confusion in the sale of such products. See also Dwinell-Wright Co. v. White House Milk Co., 2 Cir., 132 F. 2d 822, where it was held that milk was not a product of the same general class as tea and coffee.

█ In the instant situation we think it quite persuasive that there was no confusion as to source or origin as between the sale of fuel oil and coal; in fact, no confusion was engendered as between the plaintiff and the defendant while the latter sold fuel oil under the trade names of Standard Oil. It was only when the defendant engaged in the fuel oil business under the trade name in controversy that the confusion arose. We are of the view that the solid products which defendant sold were not of the same descriptive class as the fuel oil sold by plaintiff.

In this connection it is pertinent to note that the lower court, contrary to the findings of the Master, found:

"Each of the parties has known since 1927 that the other was engaged in the sale of fuel oil and testimony given by plaintiff's president, Isador Schurman, that 'It first came to my attention that Consumers Company was engaged in the sale of fuel oil in 1939,' is hereby found to be untrue. Plaintiff made no protest or objection to defendant's engaging in the fuel oil business under its corporate name until January 26, 1940 when it sent to defendant a letter of protest which is in evidence as plaintiff's Exhibit No. 1."

We think there is no basis for the court thus characterizing the testimony of plaintiff's president as to his knowledge concerning the time defendant first engaged in the sale of fuel oil. What the witness evidently was referring to was the time when the defendant commenced the sale of fuel oil on its own account and under its own name, which admittedly was early in 1939. It is obvious that there was no occasion for any concern on the part of the plaintiff prior to that time for the reason that the record indisputedly shows that there was no confusion on the part of customers as to the source and origin of fuel oil prior thereto.

Other findings of the lower court may be noted at this point. It found:

"Plaintiff was familiar with defendant's standing, activities and extensive advertising when it (plaintiff) entered the fuel oil business. It immediately began using the single word 'Consumers' in the marking of its trucks and in other displays."

In view of the authorities subsequently cited, we think this finding is of no consequence.

█ The court also found:

"Since 1913 defendant's corporate powers have continuously included the power 'to deal in coal, coke, wood and other fuel of all kinds.' The sale of fuel oil is hereby found to be within this charter power."

Assuming the accuracy of this finding, we think it is beside the point. It does not follow from the fact that the defendant had a right under its charter power to engage in the sale of fuel oil that it also had a right to engage in the sale of such oil under a name, even its own name, which had previously been put to use by a competitor in the sale of such commodity.

It would unduly prolong this opinion to cite, much less discuss, the numerous cases relied upon by the respective parties. Some of the more important will suffice. Defendant relies upon a number of cases in support of its contention that an individual or a corporation has a property right in his or its name and an inherent right to use it if it is lawfully possessed or acquired. Howe Scale Co. v. Wyckoff, 198

U.S. 118, 140, 25 S.Ct. 609, 49 L.Ed. 972; Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 10 Cir., 56 F.2d 973, 977; Elgin Butter Co. v. Elgin Creamery Co., 155 Ill. 127, 137, 40 N.E. 616. The most important of these cases are the Howe Scale Company case and the Elgin Butter Company case, and while they furnish some support for the broad proposition advanced by the defendant, we think their rationale has been considerably limited by the more recent decisions.

For instance, in Waterman Co. v. Modern Pen Co., 235 U.S. 88, 94, 35 S.Ct. 91, 92, 59 L.Ed. 142, the court stated:

"In support of this proposition the defendant lays hold of language in Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U.S. 118, 140, 25 S.Ct. 609, 49 L.Ed. 972, 986, and in other books, to the effect that courts will not interfere with the use of a party's own name 'where the only confusion, if any, results from a similarity of the names, and not from the manner of the use.' But, whatever generality of expression there may have been in the earlier cases, it now is established that when the use of his own name upon his goods by a later competitor will and does lead the public to understand that those goods are the product of a concern already established and well known under that name, and when the profit of the confusion is known to, and, if that be material, is intended by, the later man, the law will require him to take reasonable precautions to prevent the mistake."

The Illinois Supreme Court in Johnson Mfg. Co. v. Johnson Skate Co., 313 Ill. 106, 125, 144 N.E. 787, likewise distinguished the Howe Scale Company case. The same court, in Koebel v. Chicago Landlords' Protective Bureau, 210 Ill. 176, 183, 71 N.E. 362, 364, 102 Am.St.Rep. 154, also distinguished the Elgin Butter Company case, and stated:

"We think the true ground upon which the jurisdiction of a court of equity to restrain the defendants, as prayed in this bill, rests, is that the name assumed by the defendants is so similar to that of the complainant as to mislead and confuse the public mind in the city of Chicago as to the

identity of the business in which the two parties were engaged."

In Investors Syndicate of America, Inc., et al. v. Edward J. Hughes, 378 Ill. 413, 422, 38 N.E.2d 754, 759, the court stated:

"Even in injunction cases between competing corporations the trend of decision is to place less emphasis on competition and more on confusion. * * * [Citing cases.]."

Lady Esther, Ltd. v. Lady Esther Corset Shoppe, Inc., 317 Ill.App. 451, 46 N.E.2d 165, 148 A.L.R. 6, is another case in which defendant was enjoined from using its corporate name similar to that of the plaintiff, even though not in direct competition. The element of confusion as to origin was recognized as of controlling importance.

■ Where the similarity of names results in confusion as to the origin of products, it seems to be immaterial whether such names be treated as trade marks or trade names. The court in American Steel Foundries v. Robertson, Commissioner, et al., 269 U.S. 372, 380, 46 S.Ct. 160, 162, 70 L.Ed. 317, comments upon this situation and states:

"A corporate name seems to fall more appropriately into the latter class [trade name]. But the precise difference is not often material, since the law affords protection against its appropriation in either view, upon the same fundamental principles."

The court on the following page stated:

"The general doctrine is that equity not only will enjoin the appropriation and use of a trade-mark or trade-name, where it is completely identical with the name of the corporation, but will enjoin such appropriation and use where the resemblance is so close as to be likely to produce confusion as to such identity, to the injury of the corporation to which the name belongs."

It will be noted that the court is speaking not only of the appropriation of a trade name but its use; in fact, the court stated, 269 U.S. page 380, 46 S.Ct. 162, 70 L.Ed. 317:

"The mere fact that one person has adopted and used a trade-mark on his goods does not prevent the adoption and use of

the same trade-mark by others on articles of a different description. There is no property in a trade-mark apart from the business or trade in connection with which it is employed."

In Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 415, 36 S.Ct. 357, 361, 60 L. Ed. 713, the court, referring to trade marks, stated:

"Of course, if the symbol or device is already in general use, employed in such a manner that its adoption as an index of source or origin would only produce confusion and mislead the public, it is not susceptible of adoption as a trademark."

In United Drug Company v. Theodore Rectanus Company, 248 U.S. 90, 97, 39 S. Ct. 48, 50, 63 L.Ed. 141, the court stated:

" * * * the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business."

In Esso, Inc. v. Standard Oil Co., 8 Cir., 98 F.2d 1, 6, the court stated:

"As between conflicting claimants to the right to use a name or mark, priority of appropriation implies more than priority in employment of the mark. It means that he who first employed the mark in a particular market has the better right in that market."

It has also been held that a person or corporation who adopts and uses a trade mark in one territory will not be permitted to extend its use into a different territory where in so doing confusion as to origin will result. In Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, page 81, 54 S.Ct. 315, page 321, 78 L.Ed. 655, the court stated:

"An analogy may be found in the decisions on the law of trade marks, where the principle is applied that a name legitimate in one territory may generate confusion when carried into another, and must then be given up."

In Fruit Industries, Limited v. Bisceglia Bros. Corp., 3 Cir., 101 F.2d 752, 754, the court cited the Hanover Star Milling Company case, supra, in support of its holding that the senior user of a trade mark is barred from interfering with a junior user of the same mark when the latter user in good faith and without notice of its use by the senior user expends money and effort in building up a substantial business in a territory which has been unoccupied for a long time by the senior user's business.

■■ From these authorities and others which could be cited, it appears to be an established principle that a person or corporation can acquire a property right in a trade mark or trade name only by use of such mark or name in connection with goods of the same descriptive class. Applying this principle, we are of the view that the defendant acquired no property right in the trade name "Consumers," as applied to fuel oil, for the reason that it did not use such name in that connection until 1938, and long prior to that time the trade name had been appropriated and used by the plaintiff in connection with such business. As a corollary, plaintiff in 1925 had a right to appropriate and use the name in connection with fuel oil.

■ In this connection, we have not overlooked defendant's argument, stressed by the lower court, that during the period from 1927 to 1938, when defendant was engaged in a limited fashion in selling fuel oil under the trade names of the Standard Oil Company, it advertised fuel oil in the telephone directory, by billboards and otherwise. It has been frequently held in Illinois, however, that "The mere adoption and use of words in advertisements, circulars and price lists and on signs and stationery give no exclusive right to their use." DeLong Hook and Eye Co. v. Hump Hairpin Mfg. Co., 297 Ill. 359, 364, 130 N.E. 765, 767; Hazelton Boiler Co. v. Hazelton Tripod Boiler Co., et al., 142 Ill. 494, 507, 30 N.E. 339.

The defendant also argues that a private party has no right to complain about the use by a corporation of its corporate name in the absence of fraud, deception or palming off, especially when there is no secondary significance attached to the name of the plaintiff. Three decisions, all by this

court, are relied upon in support of this contention. General Industries 'Co. v. 20 Wacker Drive Building Corp., 7 Cir., 156 F.2d 474; Wilhartz v. Turco Products, Inc., 7 Cir., 164 F.2d 731; California Fruit Growers Exchange, et al. v. Sunkist Baking Co., 7 Cir., 166 F.2d 971. In fact, it is claimed that the General Industries case is decisive here. We think defendant's reliance on this case is ill founded. The case involved the possibility of incidental confusion in the future arising from mere similarity of corporate names as between corporations who were not in competition with each other. In fact, the defendant was merely threatening to do business under a corporate name similar to that of the plaintiff. As the court pointed out, 156 F.2d page 476, "The parties are not found to be or likely to be in competition with each other." Also, the court relied heavily upon the absence of a showing of any actual confusion. In contrast, the parties here are actually engaged in competition with an undisputed finding that the similarity of names has created a confusion among their customers as to the source or origin of fuel oil.

The California Fruit Growers case affords even less support for the defendant's contention. There, we expressed the view, 166 F.2d page 973, that it is the confusion of origin or sponsorship and not confusion of goods which is the controlling factor. Not only was there no finding by the trial court of confusion, but as this court held, there was no finding of a likelihood of confusion as to the source or origin. In the instant case, we have a finding which in that case was absent.

The Wilhartz case is also distinguishable on the ground that there was no finding or evidence to support a finding of the likelihood of confusion as to the source of plaintiff's product.

Moreover, assuming arguendo that the defendant had a right to use the name "Consumers" in connection with the sale and distribution of fuel oil in 1925, we think it lost such right by its failure to so use it, especially in view of the fact that plaintiff commenced and continuously used the name in connection with its fuel oil business. As was stated in the Hanover Star Milling Co. case, supra, 240 U.S. page 418, 36 S.Ct. 362, 60 L.Ed. 713:

"It results from the general principles thus far discussed that trademark rights, like others that rest in user, may be lost by abandonment, nonuser, laches, or acquiescence. * * * As to laches and acquiescence, it has been repeatedly held, in cases where defendants acted fraudulently or with knowledge of plaintiffs' rights, that relief by injunction would be accorded although an accounting of profits should be denied."

While no appeal has been taken from the court's decree dismissing its cross-complaints, we think the fact that defendant made no protest as to the plaintiff's use of the name "Consumers" in connection with its fuel oil business from 1925 until the defendant filed its answer and cross-complaint after the institution of the present suit, is inconsistent with its present contention that plaintiff's use was wrongful from the beginning. See Menendez v. Holt, 128 U.S. 514, 524, 9 S.Ct. 143, 32 L.Ed. 526. Not only did the defendant abandon any right which it might have had to use the name in connection with the fuel oil business, but its long silence constituted a recognition of such right on the part of the plaintiff.

We, therefore, are of the view that defendant's use of the trade name "Consumers" in connection with the sale of fuel oil commenced in 1938 was a violation of plaintiff's right to the use of such trade name and that it amounted to unfair competition. Furthermore, we disagree with the lower court's conclusion that plaintiff's long delay in taking action against the defendant constitutes laches barring all relief, or that it is barred by estoppel. In our view of the case, there was no occasion for plaintiff to institute an action against the defendant until 1938, when the latter commenced use of the trade name in connection with its fuel oil business, which was the direct cause of the confusion in that line of business; in fact, it is doubtful, under the authorities heretofore referred to, if plaintiff could have maintained an action prior to that time. Certainly it could not have done so

during the period of 1925 to 1927, because defendant was not engaged in the fuel oil business during those years in any capacity. From 1927 to 1938, the plaintiff suffered no harm for the reason that defendant's limited fuel oil business was not conducted under the name "Consumers" but under trade names of the Standard Oil Company. No question is raised but that plaintiff subsequent thereto and in apt time served a notice on the defendant protesting the latter's right to the use of the name "Consumers" in connection with its fuel oil business, and that suit was thereafter appropriately instituted.

■ Another important and troublesome question is whether plaintiff, in addition to injunctive relief, is entitled to a monetary award. That the latter does not follow as a matter of course is plain from the authorities. Saxlehner v. Siegel-Cooper Co., 179 U.S. 42, 21 S.Ct. 16, 45 L.Ed. 77; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 419, 36 S.Ct. 357, 60 L.Ed. 713; Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 130, 67 S.Ct. 1136, 91 L.Ed. 1386. The Master recommended that the defendant be ordered to pay to the plaintiff gains and profits which plaintiff lost subsequent to January 26, 1940 (the date of plaintiff's letter of protest), found to be $167,348.26. Concerning this recommendation, the court stated: "The Master has awarded damages based on pure fiction." While we find it difficult to grasp the precise basis upon which the Master's recommendation was made, it is sufficient for the present to note that the award represented the entire profits which the defendant made on the sale of oil during the relevant period. Thus, it appears to have been predicated on the rather incredulous theory that plaintiff would have sold all the fuel oil sold by the defendant if the latter had not wrongfully appropriated and used the trade name in controversy. And this in face of the fact that there were scores of concerns engaged in the Chicago area in the sale of fuel oil.

While numerous authorities are relied upon in support of the opposing contentions concerning the Master's monetary award, we think it is sufficient to refer to three decisions of the Supreme Court. Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629; Mishawaka Mfg. Co. v. Kresge Co., 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381; Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1368. The defendant relies upon the first two of these cases, while the plaintiff relies upon the latter. The decisions in both the Hamilton Shoe Company case and the Mishawaka case appear to be confined to situations where a statutory trade mark infringement was involved. It is true in the former case both trade mark infringement and unfair competition were found, but the criterion employed in determining the character and burden of proof necessary to support a monetary award appears to have been based upon the former. In fact, the court pointed out, 240 U.S. page 256, 36 S.Ct. 270, 60 L.Ed. 629: " * * * it will not be necessary to pass upon the question of the proper measure of recovery in a non-trademark case." The court stated, 24 U.S. page 261, 36 S.Ct. 273, 60 L.Ed. 629:

"Not only do the findings of the court of appeals, supported by abundant evidence, show that the imitation of complainant's mark was fraudulent, but the profits included in the decree are confined to such as accrued to defendant through its persistence in the unlawful simulation in the face of the very plain notice of complainant's rights that is contained in its bill."

Under such circumstances the court held that the defendant must part with the profits which accrued to it "on the theory of a trust ex maleficio."

The Mishawaka case was predicated solely on statutory trade mark infringement; no unfair competition was involved. The court stated, 316 U.S. page 204, 62 S.Ct. 1023, 86 L.Ed. 1381:

"Deeming the matter to present an important question under the Trade-Mark Act we brought the case here * * * solely to review the provisions of the decree dealing with the measure of profits and damages for the infringement found by the two lower courts. Whether there was such an infringement as to entitle the petitioner

to the remedies provided by the federal trade-mark laws is therefore not open here."

The decision appears to turn upon a provision of the Trade Mark Act, 15 U.S. C.A. § 81 et seq., which provides for the recovery of profits and damages for the wrongful use of a trade mark. Even so, three members of the court dissented on the ground that there was no proof that the defendant's goods had been wilfully palmed off as those of the plaintiff.

In the Champion Spark Plug case, both statutory trade mark infringement and unfair competition were involved. There, the District Court allowed an injunction for trade mark infringement but denied an accounting. The Circuit Court of Appeals affirmed the District Court and also held the defendant guilty of unfair competition. While the Supreme Court recognized, 331 U.S. page 130, 67 S.Ct. 1139, 91 L.Ed. 1368, "that where unfair competition is established, any doubts as to the adequacy of the relief are generally resolved against the transgressor," it went on to state, "But there was here no showing of fraud or palming off. Their absence, of course, does not undermine the finding of unfair competition. [Citing cases.] But the character of the conduct giving rise to the unfair competition is relevant to the remedy which should be afforded." The court as to its decision in the Mishawaka case stated, 331 U.S. page 131, 67 S.Ct. 1139, 91 L.Ed. 1368:

"But it does not stand for the proposition that an accounting will be ordered merely because there has been an infringement. Under the Trade Mark Act of 1905, as under its predecessors, an accounting has been denied where an injunction will satisfy the equities of the case. [Citing cases.] The same is true in case of unfair competition."

 It is here conceded by the plaintiff, as was found both by the Master and the court below, that the defendant was guilty of no fraud or palming off but that the case is solely one of confusion of corporate identity or trade name. In fact, we are satisfied there is nothing in defendant's conduct that demonstrates a lack of honesty or good faith. The vigorous and apparently sincere effort which it has made both in the court below and here to maintain its legal right to the use of its own name in connection with the sale of fuel oil is at least some demonstration that it did not purposely or intentionally transgress the rights of the plaintiff. And the fact that we have concluded that its conduct was wrongful neither impairs nor dispels the idea that it acted in good faith. Under the circumstances, we are of the view and so hold that the rights of the plaintiff will be sufficiently protected by an injunction and that the equities of the situation are such that a monetary award should be denied.

The decree of the lower court is, therefore, affirmed in part and reversed in part, with directions to proceed in accordance with the views herein expressed.

MINTON, Circuit Judge (dissenting).

I am unable to agree with the majority, and I believe it worthwhile to state my views briefly. I start out with the proposition that unfair competition is a tort. It is a wrong. If there is no wrong committed, there can be no relief. Clearly, confusion itself is not the wrong and confusion which may arise from the mere use of a descriptive word in the public domain can of itself lead to no action. We have already said as much in General Industries Co. v. 20 Wacker Drive Bldg. Corporation et al., 7 Cir., 156 F.2d 474, 476-478. The Supreme Court said in Howe Scale Co. v. Wyckoff et al., 198 U.S. 118, 140, 25 S.Ct. 609, 614, 49 L.Ed. 972: " * * * courts will not interfere where the only confusion, if any, results from a similarity of the names, and not from the manner of the use."

The Illinois Supreme Court, whose statements of the law bind us in this case, said in Hazelton Boiler Co. v. Hazelton Tripod Boiler Co. et al., 142 Ill. 494, 509, 30 N.E. 339, 345:

"If any confusion has occurred, it has arisen from the similarity of the two corporate names, and not from any attempts on the part of the defendant to deceive. But, as we have already held, the similarity

of names is a circumstance of which the complainant has no right to complain, the defendant having at least as good a right to the use of its corporate name in the transaction of its business as the complainant has to use its name. If injury results to the complainant from such cause, it is damnum absque injuria."

An eminent authority, Mr. Nims, in Unfair Competition and Trade Marks, Vol. 1, Sec. 92, p. 280, says:

"Where the names consist of descriptive or geographical words, and neither party can show that its name has a secondary meaning, priority of use does not avail. * * * If plaintiff had attached to the descriptive words a distinguishing feature, it could have prevented the copying of that distinguishing feature."

The foregoing authorities state the law as I understand it. If there is a wrong that leads to confusion or the likelihood thereof, there may be an action. So if there is a valid trade-mark and it or a colorable imitation is used by another so that there is likelihood of confusion, that is infringement and is actionable. So with a trade name that has acquired a secondary meaning. The use of that name in a manner that would likely lead to confusion is actionable. If the name has acquired no secondary meaning, it must be used in a way that is deceptive or for the fraudulent purpose of palming off the goods of one as the goods of another or such *misuse* of the name must create likelihood of confusion. There must always be some element of wrongdoing that results in or is likely to result in confusion. So it is in any tort. There must be a wrong that injures. Wrong is the basis of the whole conception of tort action, whether it be in unfair competition or otherwise.

The word "Consumers" is the only word in issue here. "Consumers" is a descriptive word in the public domain, incapable by the mere act of appropriation of becoming the exclusive property of any one. The plaintiff has not attempted to register the name as a trade-mark and there is no finding of secondary meaning attaching to the word as used by the plaintiff. The majority opinion freely admits: " * * * that the

defendant was guilty of no fraud or palming off but that the case is solely one of confusion of corporate identity or trade name. In fact, we are satisfied there is nothing in defendant's conduct that demonstrates a lack of honesty or good faith."

If these things be true, and they cannot be disputed, then I ask what wrong has the defendant committed? What the question boils down to is this: Does the mere confusion arising from the use by the parties of the same descriptive word, which word is in the public domain, give the first user in the field the exclusive right to use that name? The majority holds that it does, but its authorities do not support its holding. The Waterman, Lady Esther, and Johnson cases were all cases where secondary meaning was expressly found or not disputed. In the Landlords' Protective case there was evidence of misrepresentation and wrongful conduct. The Investors Syndicate case involved an administrative act of the Secretary of State of Illinois in passing on an application for the right to use a certain corporate name. The statute set the standard he was to observe, and his discretion was not disturbed. Cases of this kind are not authorities in the field of unfair competition. Nims, Unfair Competition and Trade Marks, Vol. I, Sec. 82, p. 247.

The majority opinion's error in this regard stems from its misconception of the issue here. Since the Lady Esther case, it is certainly the law in Illinois that the parties need not be competing in the same market for the same customers for unfair competition to occur. In this context the courts often remark on the law's emphasis on confusion rather than competition, but the courts do not overlook the initial requirement of the defendant's wrongful appropriation of a word to which the plaintiff has established his right. Since in this case the parties are in competition, the issue raised by such cases is not involved.

Even if there were law for the majority's opinion, which I respectfully submit there is not, the plaintiff is not the first user of the name in any such sense as would authorize a court of equity to interfere. From

1913 to 1925, when the plaintiff was organized, the defendant used the name "Consumers" in the general fuel business in Chicago and had built up considerable good will in that field when the plaintiff came along. With the whole lexicon of names to choose from in order to enter a branch of the fuel field in Chicago, the plaintiff chose the defendant's name, already in use in the general fuel field. The defendant had a well known and widely advertised seal which it used in its business, and the plaintiff imitated that seal in its fuel oil business. Such conduct on the part of the plaintiff warranted the District Court in finding that: "Its adoption of a similar name and seal is hereby found not to have been innocent or accidental" and its conclusion of law that the plaintiff did not come into court with clean hands.

In 1927 the defendant was advertising fuel oil in the same media in juxtaposition to the plaintiff's advertising, and was selling fuel oil furnished it by Standard Oil but sold under the name and seal of the defendant. The defendant did not expand its fuel oil business until 1938 when it installed its own tanks and began to sell fuel oil extensively. That it had a right to do. That was fair competition, in which the public has an interest. The defendant only continued to use its name as it had used it for twelve years before the plaintiff came into existence and for thirteen years after the plaintiff came into existence. The District Court found that: "Defendant in engaging in the fuel oil business under its established corporate name did not do so with any improper motive and no fraudulent, improper or unfair act on the part of defendant has been proved."

The plaintiff argued, and the majority of the court was impressed with the argument, that not until 1938, when the defendant changed its method of selling fuel oil by selling its own product and not that of another and engaged more extensively in the fuel oil business, did the plaintiff begin to feel the impact of the defendant's competition, and that the defendant then began to share in the good will built up by the plaintiff in the fuel oil business. There was nothing wrong or unfair about that. The Supreme Court said in Kellogg Co. v. Nat. Biscuit Co., 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L.Ed. 73:

"Kellogg Company is undoubtedly sharing in the goodwill of the article known as 'Shredded Wheat'; and thus is sharing in a market which was created by the skill and judgment of plaintiff's predecessor and has been widely extended by vast expenditures in advertising persistently made. But that is not unfair. Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested. There is no evidence of passing off or deception on the part of the Kellogg Company * * *."

The only evidence of questionable conduct in the instant case is that of the plaintiff.

I agree with the District Court that the complaint should have been dismissed as without equity and for the further reason that the plaintiff did not come into court with clean hands. I would deny equitable relief and certainly would agree that there are no damages due the plaintiff.